LCDO. MELVIN W. ROBLES SANABRIA, *Ex parte*.

*Número:* MC-90-21 *Resuelto:* 25 de junio de 1993

*Melvin W. Robles Sanabria, pro se*; *Gretchen Coll Martí,* abogada de la *Corporación de Servicios Legales de Puerto Rico, Inc.,* interventora.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante petición al amparo de la Regla 50 de nuestro Reglamento, 4 L.P.R.A. Ap. I-A, acude ante nos, *pro se,* el Lcdo. Melvin W. Robles Sanabria y solicita la revocación de una resolución del Tribunal Superior, Sala de Utuado, que

le designó como abogado de oficio del Sr. Ceferino Corraliza en la acción de reclamación de alimentos que en su contra iniciare la Sra. María A. Pérez, su ex esposa.

El licenciado Robles Sanabria se desempeña como abogado en el Centro de Servicio Directo de Utuado de Servicios Legales de Puerto Rico, Inc. (en adelante el Centro). Sostiene, en síntesis, que su designación da lugar a un insalvable conflicto de intereses, toda vez que otros abogados del Centro habían representado a ambas partes en la acción de divorcio por mutuo consentimiento en la cual se estipuló la pensión alimentaria cuyo pago ahora reclama la señora Pérez.

Nos corresponde resolver una cuestión novel. De acuerdo con nuestros precedentes en *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778 (1984), e *In re Orlando Roura*, 119 D.P.R. 1 (1987), el Canon 21 del Código de Ética Profesional de 1970 (4 L.P.R.A. Ap. IX) prohíbe que cualquiera de los abogados que participaron en la acción de divorcio asuman ahora la representación del señor Corraliza. La interrogante es si la descalificación de estos abogados se extiende al licenciado Robles Sanabria de manera que éste quede igualmente vedado de asumir dicha representación.

La dilucidación de este asunto requiere que abordemos la doctrina de la descalificación imputada recientemente promulgada en *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, 133 D.P.R. 112 (1993), y que precisemos su relación con la doctrina sobre la representación sucesiva adversa adoptada en *In re Carreras Rovira y Suárez Zayas*, supra, en el contexto específico de un centro de servicio directo de Servicios Legales de Puerto Rico, Inc. (en adelante Servicios Legales de P.R.).

Resolvemos que la previa participación de otros abogados del Centro en la acción de divorcio impide que el licen-

ciado Robles Sanabria asuma ahora la representación del señor Corraliza. Revocamos.

## I

Allá para 1985 los esposos Ceferino Corraliza Rivera y María A. Pérez Rivera acudieron al Centro de Servicio Directo de Utuado de Servicios Legales de P.R. y solicitaron representación para una acción de divorcio por consentimiento mutuo. El Lcdo. Miguel Negrón celebró la entrevista inicial.

El 9 de diciembre de 1985 otro abogado del Centro, el Lcdo. Juan I. Pérez Juarbe, presentó la petición ante el Tribunal Superior, Sala de Utuado, Caso Civil Núm. CS-85-1648, *Ex parte, María A. Pérez Rivera y Ceferino Corraliza Rivera*. Ambos cónyuges comparecieron a la vista ante el tribunal asistidos por un tercer abogado del Centro, el Lcdo. Antonio A. Plaza. El 28 de febrero de 1986 el tribunal dictó una sentencia en la que decretó la disolución del matrimonio y ordenó al señor Corraliza pagar la suma mensual estipulada en concepto de pensión alimentaria.

Concluido el trámite de divorcio, la señora Pérez se trasladó a Estados Unidos de América. Unos años después, inició una acción de reclamación de alimentos contra el señor Corraliza a través de la Oficina de Alimentos Recíprocos del Tribunal Superior, Sala de Utuado, Caso Civil Núm. CS-89-1454, *María A. Pérez v. Ceferino Corraliza Rivera*. El tribunal señaló la vista del caso para el 6 de abril de 1990. Comparecieron el Fiscal y el señor Corraliza, este último sin representación legal. Para remediar su estado de indefensión, el tribunal le designó al licenciado Robles Sanabria como abogado de oficio.

Al examinar el expediente que le facilitó el tribunal, el licenciado Robles Sanabria se percató que tanto el señor Corraliza como su ex esposa habían sido representados por abogados del Centro de Servicio Directo de Utuado en la

acción de divorcio. Procedió a informar al tribunal de su empleo en el mismo Centro y a solicitar su relevo por entender que su representación del señor Corraliza daría lugar a un insalvable conflicto de intereses.

El tribunal a quo, sin embargo, sostuvo que tanto la actuación como la responsabilidad del licenciado Robles Sanabria eran individuales y que sólo estarían descalificados aquellos abogados del Centro que habían participado en la representación del señor Corraliza y de la señora Pérez. Dado que el licenciado Robles Sanabria no había participado en la acción de divorcio, el tribunal confirmó su designación como abogado de oficio del señor Corraliza.

Inconforme, el 25 de abril de 1990, el licenciado Robles Sanabria, *pro se*, acudió ante nos mediante petición al amparo de la Regla 50 de nuestro Reglamento, *supra*, acompañada de una moción en auxilio de jurisdicción, en la cual solicitó la paralización de los procedimientos ante el Tribunal Superior, Sala de Utuado, hasta tanto atendiéramos su petición. Accedimos y ordenamos la paralización solicitada. *Robles Sanabria, Ex parte*, 126 D.P.R. 382 (1990). Con el beneficio de la comparecencia como *amicus curiae* de Servicios Legales de P.R., estamos en posición de resolver.

## II

"El abogado tiene para con su cliente un deber de lealtad completa." Canon 21 del Código de Ética Profesional de 1970 (4 L.P.R.A. Ap. IX). Este deber le impone al abogado dos (2) obligaciones principales: (1) la obligación de ejercer un criterio profesional independiente en defensa de los intereses del cliente, y (2) la obligación de no divulgar los secretos y confidencias que el cliente haya compartido en el transcurso de su representación. Íd. Esta segunda obligación "continúa aun después de haber cesado las relaciones del abogado y cliente". *In re Guzmán*, 80 D.P.R. 713, 723–724 (1958).

■ En atención a estas obligaciones, el Canon 21 del Código de Ética Profesional de 1970, *supra*, dispone, en la parte pertinente, que:

Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aún cuando ambos clientes así lo aprueban. Será altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste.[1]

■ En *In re Carreras Rovira y Suárez Zayas*, supra, págs. 791–792, interpretamos esta disposición en conformidad con la doctrina del *common law* norteamericano sobre la representación sucesiva adversa.[2] 4 L.P.R.A. Ap. IX, C. 21; *In re Guzmán*, supra, págs. 723–726. Esta doctrina dispone que un abogado no puede representar a un cliente en un asunto que esté sustancialmente relacionado con otro asunto en el cual haya representado a un cliente anterior, siempre que la representación del segundo resulte adversa al primero.

■ El objetivo principal de esta doctrina es garantizar al cliente anterior que las confidencias y los secretos que compartió con su abogado en el transcurso de la pri-

---

[1] El Canon 6 del Código de Ética Profesional de 1935 disponía, en la parte pertinente, que "[l]a obligación de representar al cliente con toda fidelidad y no divulgar sus secretos o confidencias prohíbe también que se acepten igualas o empleos de otros en asuntos que afecten adversamente cualquier interés del cliente con relación al cual se hayan hecho confidencias". *Pueblo v. Rodríguez*, 48 D.P.R. 8, 10 (1935). Esta disposición correspondía al Canon 6 de los Cánones de Ética Profesional adoptados por la American Bar Association el 27 de agosto de 1908. Dispone dicho canon, en la parte pertinente: "The obligation to represent the client with undivided fidelity and not to divulge his secrets or confidences forbids also the subsequent acceptance of retainers or employment from others in matters adversely affecting any interest of the client with respect to which confidence has been reposed."

[2] El Tribunal de Distrito de Estados Unidos para el Distrito Sur de Nueva York promulgó esta doctrina por primera vez en *T.C. & Theatre Corp. v. Warner Bros. Pictures*, 113 F. Supp. 265 (S.D: N.Y. 1953). Para desarrollos recientes de la misma en las jurisdicciones estatales y en la jurisdicción federal de Estados Unidos de América, refiérase a *Current Developments: Annual Survey of Developments in Legal Ethics, Subsequent Adverse Representation*, 5 Geo. J. Legal Ethics 35, 79–85 (1991); 2 Geo. J. Legal Ethics 57, 119–128 (1988).

mera representación no serán utilizados en su contra en representaciones posteriores. *In re Carreras Rovira y Suárez Zayas*, supra, pág. 790.[3] En ausencia de esta garantía, el riesgo del uso adverso de la información compartida podría socavar la confianza del cliente en su abogado e impedir que haga la divulgación necesaria para una representación adecuada de sus intereses. Véanse: C.W. Wolfram, *Modern Legal Ethics*, Minnesota, Ed. West Publishing Co., 1986, Sec. 7.4, págs. 358 y ss.; *Developments in the Law: Conflicts of Interest in the Legal Profession*, 94 (Núm. 6) Harv. L. Rev. 1244, 1316 (1981). La doctrina es, por lo tanto, una de las formas de cimentar la relación de abogado y cliente que, según el Código de Ética Profesional, "debe fundamentarse en la absoluta confianza". Criterio General sobre los Deberes del Abogado para con sus Clientes, Código de Ética Profesional de 1970 (4 L.P.R.A. Ap. IX).

En *In re Orlando Roura*, supra, aplicamos esta doctrina al caso específico de un abogado quien, luego de subscribir la petición en una acción de divorcio por consentimiento mutuo, asumió la representación de uno de los ex cónyuges en un incidente posterior al divorcio. Concluimos que

... bajo el Canon 21 de Ética Profesional existe una insalvable incompatibilidad en que un abogado, que ha representado a ambas partes en un pleito de divorcio por consentimiento mutuo, intervenga y participe en esa condición en cualquier litigio posterior relacionado, directa o indirectamente, con las cuestiones objeto de dicho divorcio por consentimiento. *In re Orlando Roura*, supra, pág. 6.[4]

---

[3] "En esencia existe una presunción irrefutable de que información confidencial será utilizada por el abogado que representó anteriormente a un cliente y ahora asume una posición contraria a sus intereses." *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 792 (1984).

[4] Señalamos, además, que "[e]n su mínima expresión, la naturaleza de las conversaciones y confidencias de los cónyuges que presupone este trámite [el divorcio por consentimiento mutuo] —de surgir después cualesquiera controversias adicionales entre ambos, independientemente de que se haya culminado o no el divorcio—

En el presente caso, por lo menos tres (3) abogados del Centro de Servicio Directo de Utuado asistieron al señor Corraliza y a la señora Pérez en la acción de divorcio por consentimiento mutuo. De acuerdo con la doctrina adoptada en *In re Carreras Rovira y Suárez Zayas*, supra, y su interpretación en *In re Orlando Roura*, supra, el Canon 21 del Código de Ética Profesional, *supra*, prohíbe a cualquiera de esos abogados representar a uno de los dos (2) ex cónyuges en una acción contra el otro relacionada con los asuntos objeto del divorcio.

Como hemos señalado, la cuestión ante nos es si esta descalificación también se debe o no imputar a otro abogado del Centro que no participó en la representación anterior y que es ahora designado por el tribunal a quo como abogado de oficio de uno (1) de los ex cónyuges en la acción de reclamación de alimentos que en su contra inició el otro.

■ La doctrina sobre la representación sucesiva adversa se refiere a la descalificación del abogado individual que, luego de representar a un cliente, intenta representar a otro con intereses adversos. G.C. Hazard, Jr. y W.W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct*, 2da ed., Prentice Hall Law & Business, 1992, Vol. 1, Sec. 1.9:112, págs. 304–304.1. No versa directamente sobre la posible descalificación de aquellos que, a pesar de trabajar en el mismo bufete o grupo de abogados, no participaron en la representación anterior. Íd. Es por esta razón que debemos trazar, en el contexto específico de este caso, la relación de dicha doctrina con la doctrina de la descalificación imputada recientemente promulgada en *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra.

---

obliga a que ese abogado se abstenga de representar a cualesquiera de ellos". *In re Orlando Roura*, 119 D.P.R. 1, 6 (1987).

# III

El Preámbulo al Código de Ética Profesional de 1970 dispone que "[e]stará vedado al abogado violar los presentes cánones aun por medios indirectos o mediante el empleo de terceros". 4 L.P.R.A. Ap. IX; *Código de ética que regirá la conducta de los miembros de la profesión legal de Puerto Rico de 1970,* 99 D.P.R. 999, 1003 (1970), Apéndice. Entre otras cosas, esta prohibición impide que abogados personalmente descalificados por razón de una regla de conducta profesional la burlen por medio de otros letrados que no se encuentran igualmente descalificados. *P.R. Fuels, Inc. v. Empire Gas Co., Inc.,* supra.

Dudosa sería la eficacia del Código de Ética Profesional si se pudieran evadir sus disposiciones mediante el uso de otros abogados. Cabría cuestionar, por ejemplo, la protección que ofrece la doctrina sobre la representación sucesiva adversa si el letrado descalificado pudiese evitar el conflicto con sólo referir el asunto posterior a otro miembro de su bufete que no se encuentra personalmente descalificado.

En *P.R. Fuels, Inc. v. Empire Gas Co., Inc.,* supra, promulgamos la doctrina de la descalificación imputada precisamente para atender este riesgo en bufetes o grupos de abogados. Esta doctrina autoriza, en ciertas circunstancias, la descalificación de todo un bufete o grupo de abogados si uno o más de sus integrantes está personalmente descalificado a raíz de un conflicto de intereses. La descalificación personal se denomina "descalificación primaria" y la de los demás miembros del bufete o agrupación "descalificación secundaria". Wolfram, *op. cit.,* Sec. 7.6.2, pág. 393.

El objetivo principal de esta doctrina es proteger al cliente que acude a un bufete o grupo de abogados contra violaciones vicarias de las reglas sobre conflictos de intereses. 4 L.P.R.A. Ap. IX, C. 21; 8 (Núm. 4) *ABA/BNA*

*Lawyer's Manual on Professional Conduct* 51 (1992); Hazard y Hodes, *op. cit.*, Sec. 1.10:103, págs. 320–322. Esta protección pretende asegurar al cliente la completa lealtad de sus abogados y la de aquellos con quienes estén afiliados.

Por un lado, promueve el ejercicio de un criterio profesional independiente mediante la descalificación del bufete o agrupación de aquellas representaciones que alguno de sus miembros no pueda aceptar. Véase *Current Developments: Survey of Developments in Legal Ethics*, 5 (Núm. 1) Geo. J. Legal Ethics 35, 87–89 (1991). Por otro, protege al cliente contra el uso adverso de sus confidencias y secretos por aquellos abogados del bufete o agrupación que no participaron directamente en su representación. Íd.

La doctrina comparte, por lo tanto, una unidad de propósito con la doctrina sobre la representación sucesiva adversa, a saber, cimentar la confianza del cliente en sus abogados y así promover el buen funcionamiento del sistema adversativo de administración de justicia.

Los postulados de la doctrina de la descalificación imputada, sin embargo, no pueden ser igualmente reducidos a una sola regla. La descalificación del bufete o agrupación es una descalificación secundaria. Entiéndase que responde al conflicto particular que propicia la descalificación primaria de alguno de los abogados. La descalificación secundaria, por lo tanto, tiene que ajustarse a la variedad de conflictos que puedan surgir en cada caso particular. Un conflicto por representación concurrente, por ejemplo, no presenta los mismos riesgos que un conflicto por representación sucesiva. *In re Carreras Rovira y Suárez Zayas*, supra, págs. 786–793.([5])

---

([5]) Un conflicto por representación concurrente surge cuando un abogado intenta representar simultáneamente a clientes con intereses incompatibles entre sí. *In re Carreras Rovira y Suárez Zayas*, supra, págs. 788–789. El conflicto por representación sucesiva ocurre cuando el abogado intenta representar a un cliente en un asunto que puede afectar adversamente los intereses de otro cliente anterior. Íd., pág. 790; *In re Concepción Suárez*, 111 D.P.R. 486, 491 (1981). Ambos conflictos

Por otro lado, cada conflicto puede implicar otras consideraciones no necesariamente relacionadas con el conflicto en sí, pero que deben ser atendidas al momento de configurar la regla aplicable al caso particular. En *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra, por ejemplo, señalamos que la doctrina no debe menospreciar el efecto adverso de la descalificación sobre la parte que pierde su abogado. También indicamos que debe atender el posible efecto restrictivo que pudiera tener sobre la movilidad de los abogados en el mercado de empleos. Íd.

Esta variedad de consideraciones, al igual que la variedad de posibles conflictos, hace difícil la elaboración de una norma precisa de descalificación imputada. *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra. El eje de la descalificación siempre es el mismo, a saber, la imputación a todos los abogados del bufete o agrupación de la causal que propicia la descalificación primaria de alguno de ellos. El cáracter particular de esta imputación, sin embargo, puede variar de acuerdo con la clase de conflicto que presente el caso y a las otras consideraciones que sea menester atender.

Al igual que *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra, el caso ante nos presenta un posible conflicto por representación sucesiva adversa. La preocupación principal en este tipo de caso es la protección del cliente contra el uso adverso de sus secretos y confidencias. *In re Carreras Rovira y Suárez Zayas*, supra, pág. 790. La causal de descalificación primaria es precisamente el conocimiento de tales confidencias por parte de uno o más de los abogados del bufete o agrupación. El cliente, por lo tanto, necesita una garantía de que éstas no serán utilizadas en su contra por aquellos abogados que no participaron en el

---

presentan un riesgo de uso indebido de confidencias, pero el conflicto por representación concurrente presenta el riesgo adicional de la falta de un criterio profesional independiente. *In re Carreras Rovira y Suárez Zayas*, supra, págs. 788–793.

asunto anterior. *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra.

En atención a esta necesidad, la doctrina autoriza la imputación de la causal de descalificación primaria a todos los abogados del bufete o agrupación. Según indicamos en *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra, esta imputación asume el carácter particular de una presunción de confidencias compartidas.([6]) Según el caso, esta presunción puede convertir al bufete o grupo de abogados en un solo abogado, de manera que quedaría descalificado de aquella representación que alguno de sus integrantes esté vedado de aceptar por razón de la doctrina sobre representación sucesiva adversa.

La presunción de confidencias compartidas responde, en primer lugar, a supuestos de sentido común sobre la manera en que trabajan los bufetes o grupos de abogados y sobre los motivos que llevan a los abogados a aunar esfuerzos y, en segundo lugar, a la necesidad de evitar el riesgo de una divulgación deliberada o accidental de las confidencias o secretos del cliente. *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra; Wolfram, *op. cit.*, Sec. 7.6.2, págs. 391–396; *Developments in the Law: Conflicts of Interest in the Legal Profession*, supra, págs. 1360–1370.

Es por estas razones que la presunción sólo aplica en aquellas afiliaciones o grupos de abogados caracterizadas por el libre flujo y fácil acceso a información o por incentivos considerables para que los abogados compartan información entre sí. Véanse: Hazard y Hodes, *op. cit.*, Sec. 1.10:202, págs. 325–326.2; *Annotated Model Rules of Professional Conduct*, 2da ed., Center for Professional Respon-

---

([6]) Para ilustrar las distintas formas que puede asumir la imputación, consideremos el conflicto por interés económico adverso. En este supuesto, la causal de descalificación primaria no es el conocimiento de confidencias, sino un interés económico contrario al del cliente. El riesgo no es la divulgación indebida de información, sino la división de la lealtad del abogado que puede resultar de tal interés económico. La imputación de la causal de descalificación, por lo tanto, no asumiría la forma de una presunción de confidencias compartidas.

sibility, American Bar Association, 1992, R. 1.10, págs. 173–174 y 180–183. De lo contrario, no habría una base fáctica que justifique su aplicación.

La presunción, a su vez, puede asumir distintas modalidades de acuerdo con el caso particular en el cual surja la representación sucesiva adversa y con las consideraciones adicionales que sea necesario atender. La causal de descalificación primaria puede ser imputada (1) de un abogado a otro, (2) de un abogado a su bufete, (3) de un bufete a uno de sus abogados y (4) de un bufete a otro. Wolfram, *op. cit.*, Sec. 7.6 .2, pág. 393; *Current Developments: Survey of Developments in Legal Ethics*, supra, pág. 87. Cada uno de estos cuatro supuestos puede requerir modalidades distintas de la presunción de confidencias compartidas.

La presunción en sus distintas modalidades no necesariamente conlleva la descalificación secundaria de todos los abogados del bufete o agrupación. De acuerdo con la modalidad en cuestión, ésta puede o no ser refutada por la parte que opone la descalificación. *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra; *Annotated Model Rules Of Professional Conduct*, supra, Rule 1.10, págs. 184–186; Wolfram, *op. cit.*, Sec. 7.6.3, págs. 398–401. La oportunidad de refutar se concede en aquellos casos en los cuales, ante el riesgo particular, es razonable pensar que una parte pueda demostrar, como cuestión de hecho, que no hay una razón de peso que justifique la descalificación. Véase Wolfram, *op. cit.*, Sec. 7.6.3, pág. 398.

De no ser refutable, la presunción convierte al bufete o agrupación en un solo abogado para fines de la doctrina sobre representación sucesiva adversa. De ser refutable, tal conversión ocurre solamente en ausencia de prueba suficiente para lograr la refutación.

En *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra, señalamos tres (3) modalidades diferentes de esta

presunción. En el contexto de coabogados (*co-counsels*) que representan al mismo cliente en un mismo asunto, establecimos la presunción de que los coabogados comparten información confidencial pertinente a dicha representación. Íd. Además, en el contexto de un abogado que cambia de bufete, establecimos: (1) que el abogado tuvo acceso a información confidencial en el bufete anterior y (2) que compartirá dicha información con los abogados del nuevo bufete. Íd.

Resolvimos que la modalidad aplicable en el caso de coabogados es refutable por entender que, en ciertos casos particulares, la naturaleza de la relación entre ellos puede ser tal que no compartan entre sí la información confidencial del cliente común. *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra. Véase, además, Wolfram, *op. cit.*, Sec. 7.6.3, págs. 396–397. Por otro lado, nos abstuvimos de determinar si las otras dos (2) modalidades allí establecidas eran o no rebatibles ya que tal determinación no era necesaria para resolver las controversias entonces ante nos.

 En resumen, en casos de representación sucesiva adversa, una vez dada la descalificación primaria de un abogado, la descalificación secundaria de los abogados con los cuales está afiliado dependerá, en primer lugar, de si tal afiliación constituye un bufete o agrupación sujeto a la presunción de confidencias compartidas, y en segundo lugar, de si la modalidad de dicha presunción operante en el caso es o no refutable. De no ser refutable, procede la descalificación secundaria de todo el bufete o agrupación; de ser refutable, se presume la descalificación, pero corresponde a la parte que se opone a la misma presentar la prueba necesaria para la refutación.

## IV.

A. Conforme a estos criterios, nos corresponde ahora determinar si el Centro de Servicio Directo de Utuado

constituye un bufete o grupo de abogados sujeto a la presunción de confidencias compartidas.

Sobre este particular, consideramos apropiado referirnos al comentario oficial a la Regla 1.10 de las Reglas Modelo de Conducta Profesional de la Asociación Americana de Abogados (en adelante A.B.A.), regla que trata sobre la descalificación imputada de bufetes. Explica dicho comentario que el término *firm*

> ... [I]ncluye abogados en un bufete privado y abogados empleados en el departamento legal de una corporación u otra organización, o en una organización de servicios legales. Por ejemplo, dos letrados que comparten oficina y que ocasionalmente se asisten o consultan entre sí, de ordinario, no serían considerados como un bufete. Sin embargo, si ellos se presentan al público de una manera que sugiera que constituyen un bufete o se comportan como uno, deberían ser considerados como un bufete para fines de las Reglas. (Traducción nuestra.) *Annotated Model Rules of Professional Conduct*, supra, Regla 1.10, pág. 173.

Conscientes de la variedad de afiliaciones de abogados que pueden estar sujetas a la doctrina de descalificación imputada, hemos optado por los términos "bufete" y "grupo de abogados" o "agrupación" precisamente para reflejar esta variedad.

La determinación de si el Centro constituye un bufete o agrupación para fines de la doctrina, requiere un análisis funcional de sus operaciones en atención al objetivo principal de proteger las confidencias del cliente afectado, en este caso la señora Pérez. Véase Hazard y Hodes, *op. cit.*, Sec. 1.10:202, pág. 325–326.2; Wolfram, *op. cit.*, Sec. 7.6, págs. 396–397. Los factores pertinentes que debemos considerar son, entre otros, la presencia de una empresa común, el flujo y la facilidad de acceso a la información, la división de responsabilidades, la colaboración entre abogados y la estructura de gerencia o supervisión.

De acuerdo con el alegato de Servicios Legales de P.R., el Centro es una de las treinta y dos (32) oficinas que la

corporación mantiene a través de toda la isla para atender su clientela.

> La estructura básica de un Centro de Servicio consta de un(a) abogado(a)-director(a), un(a) abogado(a)-sudirector(a), un(a) secretario(a) ejecutivo(a), algunos(as) abogados(as), paralegales, o auxiliares de Educación Comunal; algunos cuentan con trabajadores(as) sociales, auxiliares de servicios legales, personal de oficina y secretarial, y conserje. La cantidad de personal y la composición varía de centro en centro y depende de la cantidad de clientela potencial a la cual el centro debe prestar servicios. Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., pág. 8.

Cada centro sigue un procedimiento uniforme para la tramitación de los casos. Alegato de la Interventora Servicios Legales de Puerto Rico, pág. 9. Por lo general, todo cliente prospectivo es sometido a una entrevista inicial.[7] Los abogados luego se reúnen para discutir el asunto y considerar las distintas opciones disponibles al solicitante. Íd. De decidir que se acepta el caso, el mismo se le asigna a un abogado particular y se le notifica al cliente que su solicitud ha sido acogida. Íd.

Aceptado el caso, el abogado a cargo discute las alternativas con el cliente y con los restantes abogados del Centro. Esta práctica es común. Señala Servicios Legales de P.R. que:

> Los abogados de una misma oficina colaboran estrechamente unos con los otros, de manera que todos ellos, así como el director de cada oficina, logran familiarizarse con la información recibida relativa a los varios casos, lo cual permite darle a los clientes un servicio más eficaz, en caso de que alguno de los abogados tenga que ausentarse en alguna ocasión. Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., pág. 4.

---

[7] Señala el licenciado Robles Sanabria en su petición que:

"La información obtenida en la entrevista de los clientes es compartida por los demás miembros de la Oficina. Antes de ser aceptado el caso, es éste discutido en reunión de todos los abogados de la oficina para ver la acción a tomar y una vez hecho ésto, es asignado a uno en particular para trámite." Petición al amparo de la Regla 50 del Reglamento del Tribunal Supremo, pág. 3.

El manejo de la acción de divorcio del señor Corraliza y la señora Pérez es prueba suficiente de esta colaboración en el Centro. De un número aproximado de seis (6) abogados, por lo menos tres (3) participaron directamente en dicha representación. Uno (1) celebró la entrevista inicial, otro suscribió la petición y un tercero compareció a la vista ante el tribunal. Todos ellos tuvieron oportunidad de compartir información confidencial de ambos clientes.

Este alto grado de colaboración demuestra que el Centro lleva a cabo una empresa común caracterizada por un libre flujo y fácil acceso a información de clientes. Si bien cada asunto es asignado a un abogado, los demás también participan, ya sea en discusiones o en sustitución del abogado encargado. En este sistema operacional los clientes son propiamente clientes del Centro, no de los abogados particulares.

Ante esta práctica, nos parece forzosa la conclusión de que el Centro constituye un bufete sujeto a la presunción de confidencias compartidas.(8) La representación del señor Corraliza por algún otro abogado del Centro presenta un riesgo a la señora Pérez de que la información divulgada para fines de la acción de divorcio sea ahora utilizada en su contra. Es precisamente este riesgo el que requiere la intervención de la doctrina de la descalificación imputada.

B. Nos corresponde ahora precisar la modalidad de la presunción aplicable a este caso y determinar si es o no refutable.

Debido a la presencia en el Centro de abogados que participaron en la acción de divorcio y dado su funcionamiento, entendemos que la presunción asume la modalidad siguiente: que estos abogados compartirán, deliberada o

___

(8) Varios tribunales estatales que han considerado la descalificación imputada de abogados en oficinas que prestan servicios legales a indigentes han llegado a conclusiones similares. Véanse: *Borden v. Borden*, 277 A.2d 89 (1971); *Commonwealth v. Bracey*, 307 A.2d 320 (1973); *Allen v. District Court in and for Teenth Jud. Dist.*, 519 P.2d 351, 353 (Col. 1974); *Turner v. State*, 340 So. 2d 132 (1976); *Roberts v. State*, 345 So. 2d 837 (1977); *Flores v. Flores*, 598 P.2d 893 (Alaska 1979).

accidentalmente, información confidencial del cliente afectado, en este caso, la señora Pérez. A nuestro juicio, esta modalidad no permite refutación. Nos explicamos.

Cuando unos abogados están afiliados en un bufete y alguno de ellos está sujeto a descalificación primaria por conocer confidencias de un cliente anterior, siempre existe un riesgo considerable de que tales confidencias sean accidental o deliberadamente compartidas. *Developments in the Law: Conflicts of Interest in the Legal Profession*, supra, págs. 1360–1363. Este riesgo se extendería a lo largo del asunto posterior, por lo que el cliente afectado quedaría expuesto sin una protección adecuada. Es necesario, por lo tanto, proveerle una garantía de que sus confidencias no serán utilizadas en perjuicio suyo. Hazard y Hodes, *op. cit.*, Sec. 1.10:201, págs. 324–325.

Una presunción irrefutable de confidencias compartidas entre el abogado descalificado y los demás integrantes del bufete es precisamente una forma de ofrecer esta garantía. *Developments in the Law: Conflicts of Interest in the Legal Profession*, supra, págs. 1361–1362. Esta es la medida cautelar más completa que la doctrina de la descalificación imputada le puede reconocer al cliente afectado. En consecuencia, todos los integrantes del bufete quedan vicariamente vedados de aceptar aquel asunto en que alguno de ellos esté sujeto a descalificación primaria. La protección del cliente anterior toma prioridad sobre cualquier otro interés en competencia.

En las Reglas Modelo de Conducta Profesional, la A.B.A. optó precisamente por extender este alto grado de protección. *Annotated Model Rules of Professional Conduct*, supra, Regla 1.10(a), pág. 173. Dispone la Regla Modelo 1.10(a) que:

> Mientras abogados estén asociados en un bufete, ninguno de ellos podrá representar a un cliente cuando alguno de ellos practicando por su cuenta estaría impedido de hacerlo por ra-

zón de las Reglas 1.7 [regla sobre representación sucesiva adversa], 1.8(c), 1.9 o 2.2. (Traducción nuestra.)([9])

El predecesor de las Reglas Modelo, el Código de Responsabilidad Profesional, contenía una disposición similar. La Regla Disciplinaria DR-105(D) disponía que:

Si un abogado debe declinar o retirarse de una representación por razón de una Regla Disciplinaria, ningún socio, asociado, o cualquier abogado afiliado con él o con su bufete, puede aceptar o continuar tal representación. (Traducción nuestra.) *Annotated Code of Professional Responsibility*, Chicago, American Bar Foundation, 1979, DR-105(D), pág. 246.

Por su parte, los proponentes de la defensa de la "muralla china" entienden que esta misma protección se podría obtener sin necesidad de acudir a presunciones irrefutables. Véanse: Nota, *The Chinese Wall Defense to Law—Firm Disqualification*, 128 (Núm. 3) U. Pa. L. Rev. 677 (1980); Nota, *ABA Formal Opinion 88–356: New Justification for Increased Use of Screening Devices to Avert Attorney Disqualification*, 65 (Núm. 5) N.Y.U. L. Rev. 1231 (1990). Sostienen que unos mecanismos para controlar el flujo de información dentro del bufete pueden ser suficientes para proteger las confidencias del cliente anterior. *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra.([10]) Prueba de la colocación oportuna y del buen funcionamiento de estos

---

([9]) A diferencia del Canon 21 del Código de Ética Profesional de 1970 (4 L.P.R.A. Ap. IX), la Regla Modelo 1.7(a) de Conducta Profesional de la A.B.A. permite que un abogado represente a un cliente con intereses adversos a los de un cliente anterior si, luego de ser debidamente consultados, tanto el uno como el otro consiente a la representación. *Annotated Model Rules of Professional Conduct*, 2da ed., Center for Professional Responsibility, American Bar Association, 1992, Regla 1.7(a), pág. 105. El Canon 21 del Código de Ética Profesional, *supra*, prohíbe la representación sucesiva adversa aun cuando ambos clientes consientan a ella. *In re Carreras Rovira y Suárez Zayas*, supra, pág. 793.

([10]) Según indicamos en *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra, las medidas siguientes pueden contribuir a la edificación de una muralla china: (1) restricción de acceso a expedientes pertinentes; (2) control del flujo de documentos; (3) prohibición de discusiones del asunto con el(los) abogado(s) descalificado(s); (4) separación física de estos abogados, y (5) entrenamiento de los integrantes del bufete sobre el funcionamiento de la muralla.

mecanismos debería ser suficiente para refutar la presunción de confidencias compartidas. Íd.

 Ni las Reglas Modelo de Conducta Profesional ni el Código de Responsabilidad Profesional de la A.B.A. han reconocido el uso de la muralla china en casos que no involucren abogados que van del Gobierno a la práctica privada. *Annotated Model Rules of Professional Conduct*, supra; Hazard y Hodes, *op. cit.*, Regla 1.11, Sec. 1.11:100 y ss., págs. 345 y ss. En *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra, rechazamos la defensa por entender que la reciente entrada a un bufete privado de un abogado con confidencias de un cliente anterior con intereses adversos a los de un cliente del nuevo bufete en un pleito aún vigente, así como las pequeñas dimensiones de dicho bufete, hacían prácticamente imposible la implantación de una barrera de aislamiento que brindara una protección efectiva al cliente anterior.

 En el caso particular ahora ante nos, rechazamos igualmente la posibilidad de edificar una muralla dentro del Centro que brinde una protección adecuada a la señora Pérez. El Centro tiene un número aproximado de seis (6) abogados. Todos discuten abiertamente sus asuntos, tienen fácil acceso a los expedientes, intercambian labores y se sustituyen cuando la necesidad o la conveniencia así lo requieren. Ante esta dinámica, es difícil contemplar medidas que reducirían adecuadamente el riesgo de divulgación indebida y que ofrezcan una garantía sólida al cliente afectado. En el quehacer diario del Centro no es fácil distinguir quiénes saben qué sobre quién.

Entendemos, por lo tanto, que una presunción irrefutable de confidencias compartidas es la mejor protección al cliente ante un riesgo que es alto y difícil de reducir mediante otras medidas preventivas. El Centro opera como un solo abogado y sería contrario al Canon 21 del Código de Ética Profesional, *supra*, permitir que alguno de sus integrantes represente al señor Corraliza luego de que

otros lo habían representado junto a su ex esposa en la acción de divorcio. Procede la descalificación secundaria del licenciado Robles Sanabria.

## V

Servicios Legales de P.R. nos invita a ir más allá y resolver que sus treinta y dos (32) oficinas constituyen un solo bufete, por lo que todos sus abogados deberían estar sujetos a la doctrina de la descalificación imputada y vedados de asumir la representación del señor Corraliza. Declinamos la invitación.[11]

La descalificación del licenciado Robles Sanabria responde a su localización en el Centro, no a su empleo por Servicios Legales de P.R. Solamente hemos determinado que dicho Centro constituye un bufete o grupo de abogados para fines de la doctrina de la descalificación imputada en un caso de representación sucesiva adversa.

Si todas o algunas de las oficinas de Servicios Legales de P.R. serán consideradas como un bufete o grupo de abogados dependerá de un análisis funcional de la relación entre ellas, en atención al posible conflicto de intereses que presente el caso particular.

Ante esta misma problemática, el Comentario a la Regla Modelo 1.10 de Conducta Profesional de la A.B.A. expone que:

Abogados empleados en la misma unidad de una organización de servicios legales constituyen un bufete [para fines de la

---

[11] Sostiene Servicios Legales de P.R. que:

"El personal de Supervisión en [la] Oficina Central y en [el Centro de] Apoyo tiene acceso libre a todos los expedientes de casos en los 32 centros de SL [Servicios Legales de P.R.]. De igual forma, los centros comparten y discuten entre sí situaciones relacionadas a los casos que llevan y, en ocasiones, los centros entre sí y con el Centro de Apoyo, co-litigan casos. La información sobre los casos atendiéndose fluye entre los 32 centros en reuniones periódicas sobre litigación, entre otras. SL opera como un bufete, en el mejor sentido del concepto de oficina integrada." Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., pág. 9.

Regla], pero no necesariamente aquellos empleados en unidades separadas. Como en el caso de los abogados independientes, si los abogados serán tratados como afiliados los unos con los otros puede depender de la regla particular que esté envuelta y de los hechos específicos de la situación. (Traducción nuestra.) *Annotated Model Rules of Professional Conduct*, supra, Regla 1.10, pág. 174.

Por lo menos un tribunal estatal ha rehusado aplicar la presunción de confidencias compartidas a una organización de servicios legales en ausencia de prueba de que la información fluyera libremente entre sus abogados. *People v. Wilkins*, 320 N.Y.S.2d 8 (1971). Otro tribunal ha indicado que "no es una conclusión inevitable" que abogados de una organización de tal naturaleza no puedan representar a ambas partes de un caso. *Flores v. Flores*, 598 P.2d 893, 896–897 (Alaska 1979). En particular, señaló que:

Pueden desarrollarse reglamentaciones sobre tales asuntos como la preparación de expedientes, el acceso a los mismos, la supervisión y la separación física de oficinas que serían suficientes para asegurar que dos abogados empleados por A.L.S.C. [Alaska Legal Services Corporation] puedan representar a partes contrarias en un pleito, cada uno con lealtad indivisible a su cliente y completamente capaz de ejercer un criterio profesional independiente .... (Traducción nuestra.)

El presente caso no plantea la posible descalificación de un abogado que se desempeñe en otro centro de servicio directo de Servicios Legales de P.R. Nos abstenemos, por lo tanto, de resolver si todos o algunos centros constituyen un bufete o grupo de abogados o si, de constituirlo, estarían sujetos a modalidades refutables o irrefutables de la presunción de confidencias compartidas.([12]) Tales determinaciones dependerán de los hechos específicos del caso particular.

---

([12]) Igualmente, no emitimos juicio alguno sobre la posibilidad de que, ante otros hechos, una muralla china, ya sea dentro de un solo centro o entre varios centros, pueda ofrecer protección suficiente a los clientes afectados.

██ Nos limitamos a descalificar al licenciado Robles Sanabria como integrante del Centro de Servicio Directo de Utuado. Reconocemos el efecto adverso de esta descalificación sobre el señor Corraliza, pero no podemos perder de vista el riesgo que la participación del licenciado Robles Sanabria presentaría para la señora Pérez. ·

## VI

El señor Corraliza, por otro lado, no queda desprovisto de representación legal. El mejor curso de acción es referir el asunto a un abogado que no se desempeñe en los centros de Servicios Legales de P.R., para así evitar toda posibilidad de conflicto por razón de la previa participación del Centro. El tribunal a quo tiene varias alternativas ante sí.

Puede, por ejemplo, designar a otro abogado de oficio o referir el caso al Programa Pro-Bono del Colegio de Abogados de Puerto Rico, o al Programa de Práctica Compensada de Servicios Legales de P.R.

Pro-Bono, Inc. es una corporación sin fines de lucro que se dedica a ofrecer servicios legales a personas indigentes en las áreas de derecho de familia y de vivienda, y en asuntos de menores, consumidores y envejecientes. Descripción del Programa Pro-Bono, Inc., pág. 1 (en archivo en la Biblioteca del Tribunal Supremo de Puerto Rico). El programa cuenta con un número aproximado de mil ochocientos (1,800) abogados voluntarios que, a través de seis (6) centros regionales, prestan servicios a las doce (12) regiones judiciales. Íd., págs 2–3.[13] Estos abogados no reciben compensación alguna por sus labores. Íd.[14]

---

[13] El Programa Pro-Bono, Inc. tiene oficinas regionales en los municipios siguientes: Arecibo, Caguas, Humacao, Mayagüez, Ponce y San Juan. Descripción del Program Pro-Bono, Inc., *supra*, págs. 2–3.

[14] La mayoría de los fondos operacionales del Programa Pro-Bono provienen de una subvención anual otorgada por Servicios Legales de P.R. Descripción del Programa Pro-Bono, Inc., *supra*, pág. 4; Alegato de la interventora Servicios Legales de Puerto Rico, Inc., pág. 11. El programa opera de la forma siguiente:

Práctica Compensada es un programa mediante el cual Servicios Legales de P.R. refiere clientes cualificados a abogados en la práctica privada a cambio de honorarios reducidos. Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., pág. 10. Cuenta con un número aproximado de cuatrocientos (400) abogados que trabajan a través de unos paneles de servicios legales alternos adscritos a varios de los centros de servicio directo. Descripción del Programa de Práctica Compensada (en archivo en la Biblioteca del Tribunal Supremo).([15]) Este programa se presta para servir al cliente que, como el señor Corraliza, no puede recibir ayuda en un centro particular por razón de una previa representación.([16])

Los abogados en los paneles de servicios legales alternos no se desempeñan en los centros de servicio directo, sino desde sus propias oficinas.([17]) No tienen libre acceso a la información y a los materiales del centro que les refirió el caso. Todo acceso tiene que ser previamente coordinado y aprobado con el Director del centro particular. Procedi-

---

"Las solicitudes de servicio se reciben en las oficinas regionales de Pro-Bono. Los solicitantes se entrevistan con los abogados administradores de oficina y se determina la eligibilidad del cliente tomando en consideración el tipo de caso y la condición económica en cada situación individual. Cuando el caso se acepta, el cliente se refiere a un abogado voluntario de Pro-Bono, tomando en consideración la cercanía geográfica del cliente y el abogado, el tipo de caso, las destrezas, especialidad y experiencia sustantiva del abogado participante .... Las oficinas regionales hacen un seguimiento periódico de estos casos para cerciorarse que se han atendido con la diligencia debida y que los servicios ofrecidos son de calidad. Para lograr este objetivo, los abogados voluntarios reciben apoyo técnico y ayuda de Pro-Bono y del PPC [Programa de Práctica Compensada de Servicios Legales de P.R.]. Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., pág. 15.

([15]) El programa tiene, además, tres (3) paneles particulares, el Panel de Áreas Especializadas, el Panel de Derecho de Confinados y el Panel de Derecho de Menores. Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., págs. 10–16.

([16]) Para estos paneles solamente cualifican aquellos abogados que participan en el Programa Pro-Bono del Colegio de Abogados de Puerto Rico. Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., pág. 12.

([17]) Cada panel de servicios legales alternos adscrito a un centro cubre las necesidades del municipio en el cual está el centro y las de otros municipios cercanos. Descripción del Programa de Práctica Compensada (en archivo en la Biblioteca del Tribunal Supremo). Por ejemplo, el panel del Centro de Servicio Directo de Utuado cubre, además de Utuado, los municipios de Adjuntas y Jayuya. Íd.

miento para el Establecimiento del Sistema del Panel de Referimiento de Casos a Abogados en la Práctica Privada desde los Centros de Servicio (en archivo en la Biblioteca del Tribunal Supremo).[18] Por lo tanto, como regla general, estos abogados no estarían sujetos a la descalificación imputada debido a una representación previa atendida por algún centro de servicio directo.

De lo anterior se desprende que el tribunal *a quo* tenía otras alternativas de conseguir asistencia legal gratuita para el señor Corraliza que no fueron adecuadamente consideradas.[19] En estas circunstancias, procede revocar la resolución recurrida y devolver el caso al foro de instancia para que, a la mayor brevedad posible, designe otro abogado que represente al señor Corraliza en el litigio que origina este recurso.[20]

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Negrón García emitió una opinión de conformidad. El Juez Asociado Señor Rebollo Ló-

---

[18] Según Servicios Legales de P.R., "[c]ada director de centro de servicio directo que refiera un caso a un abogado en la práctica privada es responsable de supervisar y darle seguimiento al caso". Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., pág. 12.

Para evitar la anomalía de que el director del centro descalificado supervise al abogado en la práctica privada a quien ha referido el caso, entendemos que Servicios Legales de P.R. debe establecer un procedimiento para referir al cliente que ocasiona el conflicto a otro centro o a la oficina central para que desde allí se coordine el referimiento al abogado privado. La supervisión de este último debería limitarse al aspecto administrativo y no al sustantivo de la representación, para así cortar toda posibilidad de conflicto.

Igualmente, Servicios Legales de P.R. puede promulgar una reglamentación para controlar el contacto entre el abogado privado y el centro descalificado de tal manera que no se presente riesgo alguno para el cliente afectado.

[19] Otras alternativas que los tribunales no deben perder de vista son las clínicas de asistencia legal de las escuelas de derecho de la Universidad de Puerto Rico, la Universidad Interamericana, la Pontificia Universidad Católica de Ponce y el programa de servicios legales gratuitos de la Oficina de Legal de Santurce.

[20] Solamente en el caso de que estas alternativas no fueran viables, y en atención a la necesidad imperante de no dejar a una persona desprovista de asistencia de abogado, el tribunal podrá, como último recurso, considerar la designación de un abogado de otro Centro, siempre y cuando lo haga en conformidad con los postulados de la doctrina de la descalificación imputada.

pez y el Juez Asociado Señor Fuster Berlingeri emitieron sendas opiniones disidentes.

– O –

Opinión de conformidad del Juez Asociado Señor Negrón García.

I

Aunque para algunos parezcan conflictivas, la opinión emitida por el Tribunal supera nuestra preocupación inicial y se aparta de aplicar *"una norma ética en abstracto"*. (Énfasis en el original.) *Robles Sanabria, Ex parte*, 126 D.P.R. 382, 384–385 (1990), voto disidente preliminar, al cual se unió el Juez Asociado Señor Rebollo López. Descansa en un adecuado "análisis funcional" casuístico. Mantiene, además, un balance apropiado entre los valores éticos implicados salvaguardados por la doctrina de descalificación imputada expuesta en *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, 133 D.P.R. 112 (1993), y la necesidad apremiante de proveer servicios legales de *calidad* a los indigentes. La norma es compatible con nuestros pronunciamientos en *Pueblo v. Gordon*, 113 D.P.R. 106 (1983); *Pueblo v. Padilla Flores*, 127 D.P.R. 698 (1991), y las inquietudes vertidas en el aludido voto disidente preliminar.

A tal efecto, en *Pueblo v. Gordon*, supra, pág. 111 esc. 1, "aclara[mos] que no hay presunción de conflicto por el hecho de los abogados sean participantes miembros de la Sociedad para Asistencia Legal o entidad similar, toda vez que tanto su responsabilidad como su actuación son individuales y no están *necesariamente* sometidas a un criterio corporativo común". (Énfasis suplido.)

De ese modo hicimos claro que, de ordinario, la responsabilidad y actuación de los abogados de una entidad que presta servicios legales a los indigentes era individual,

pero no descartamos que en casos apropiados pudieran responder bajo un criterio corporativo común.

En *Pueblo v. Padilla Flores*, supra, revocamos la designación de un abogado de la Sociedad para la Asistencia Legal, luego que otro abogado de dicha Sociedad asumiera la representación de uno de los coacusados y se levantara la existencia de un conflicto en la representación concurrente de coacusados por intereses adversos. Ante el planteamiento *bona fide* de conflicto de interés, aplicamos en esencia un "criterio corporativo común". Aunque la opinión no lo expresó, de los autos surgía que ambos abogados laboraban en la *misma oficina* de la Sociedad.

## II

No se requiere gran visión para imaginar las consecuencias devastadoras que tendría para el suministro de servicios legales a indigentes, considerar apriorísticamente que todas las oficinas de Servicios Legales de Puerto Rico, Inc. o de cualquier entidad similar, constituyen un solo bufete a los fines de la doctrina de descalificación imputada. Los conflictos de interés aflorarían por doquier, limitando sustancialmente, por no decir paralizando, su vital función social. Por ello, en nuestro voto disidente preliminar descartamos cualquier tesis "de descalificación automática fundada en el 'criterio corporativo común' o 'un solo bufete continuo'. Esa norma no debería extenderse *incondicionalmente* a Servicios Legales de Puerto Rico, Inc. y a sus oficinas locales". (Énfasis suplido.) *Robles Sanabria, Ex parte*, supra, págs. 386-387.

En su sustrato, la opinión de hoy coincide con ese criterio, pues condiciona la aplicabilidad de la doctrina de descalificación imputada a aquellos casos de Servicios Legales, cuya situación fáctica sostenga la presunción de confidencias compartidas, piedra angular de la referida doctrina, y por ende, declina la invitación de Servicios Le-

gales de Puerto Rico, Inc. de "resolver que sus treinta y dos (32) oficinas constituyen un solo bufete ...". Opinión mayoritaria, pág. 761.

## III

Este caso pone de manifiesto una vez más "las realidades de la gran masa de puertorriqueños pobres, quienes diariamente carecen de asesoramiento legal para canalizar adecuadamente sus necesidades y, a la par, se exponen a que se les dispense justicia en estado de indefensión. ... [L]a única forma en que puede sostenerse la validez de la designación de abogados de oficio en el área de lo criminal es imprimirle *al abogado, como clase, una nueva dimensión y retomar conciencia solidarista de que es un instrumento de la paz social, forjador dinámico del derecho y socio-gestor de la justicia.* Exige adoptar un sistema integral, abarcador y compulsorio mediante el cual todo abogado —salvo excepciones justificadas— *provea un mínimo anual de servicios a los pobres".* (Énfasis en el original suprimido y énfasis suplido.) *Ramos Acevedo v. Tribunal Superior,* 133 D.P.R. 599, 624–625 (1993), opinión disidente.

¿Cuánto tiempo más transcurrirá sin alcanzarse el derrotero de que nuestro sistema de administración de justicia provea y distribuya justa y equitativamente —con la participación del mayor número de abogados— la prestación de servicios legales gratuitos a los indigentes del país?

**– O –**

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

El Tribunal, mediante la decisión mayoritaria emitida en el día de hoy, ha convertido en una *pesadilla* lo que comenzó en el año de 1989 como una *sencilla y simple* acción de reclamación de alimentos, *radicada la misma por*

*una madre necesitada en representación de sus hijos menores de edad*, ante el Tribunal Superior de Puerto Rico, Sala de Utuado; foro judicial que, *demostrando una gran sensatez*, había denegado una solicitud de auto descalificación radicada en dicho asunto por un abogado que trabaja para la Corporación de Servicios Legales de Puerto Rico.

La decisión mayoritaria emitida, no hay duda, *va más allá de una mera pesadilla*. Estas, al menos, son pasajeras y, de ordinario, no tienen graves consecuencias. La opinión que hoy suscribe una mayoría absoluta de los integrantes del Tribunal, sin embargo, no sólo no le hace cumplida justicia a ninguna de las partes envueltas en el litigio ante nuestra consideración sino que la misma *tendrá graves y duraderas repercusiones en el sistema de administración de justicia en general y sobre la clase indigente de nuestro País en particular.*

I

El 28 de febrero de 1986, mediante sentencia de divorcio por la causal de consentimiento mutuo dictada por el mencionado tribunal de instancia, quedó roto y disuelto el vínculo matrimonial que hasta entonces unía a María A. Pérez Rivera y Ceferino Corraliza Rivera. La solicitud conjunta a esos efectos fue radicada por uno de los abogados que laboraban para esa fecha en la oficina de Utuado de Servicios Legales, habiendo participado en el trámite del referido caso —esto es, desde la entrevista inicial hasta la vista en su fondo del caso— *tres* (3) abogados distintos adscritos a la referida oficina de Utuado de Servicios Legales.(¹)

Tres (3) años más tarde —esto es, en el año 1989, y residiendo la señora Pérez Rivera en los Estados Unidos de

---

(¹) La "entrevista inicial" del matrimonio Pérez-Corraliza estuvo a cargo del Lcdo. Miguel Negrón; la "petición" de divorcio por consentimiento mutuo se radicó bajo la firma del Lcdo. Juan Pérez Juarbe, y los referidos peticionarios comparecieron a la vista del caso asistidos por el Lcdo. Antonio A. Plaza.

América— ésta reclamó pensión alimenticia a su ex cónyuge a través de la Oficina de Alimentos Recíprocos del Tribunal Superior, Sala de Utuado. La vista fue señalada para el 6 de abril de 1990. El señor Corraliza Rivera compareció a la misma sin representación legal, razón por la cual el tribunal de instancia designó al Lcdo. Melvin W. Robles Sanabria como abogado de oficio. Éste procedió a examinar el expediente del tribunal y allí se percató de "que otros compañeros abogados de Servicios Legales, y específicamente de la misma oficina de Utuado donde él laboraba,"(2) habían representado al señor Corraliza Rivera y a su ex cónyuge en la acción de divorcio. Solicitó ser relevado de la representación legal del demandado por entender que existía un conflicto de intereses. El tribunal de instancia *denegó* dicha solicitud.

Inconforme, acudió el licenciado Robles Sanabria ante este Tribunal. *No obstante el hecho de que él no había sido admitido como abogado por este Tribunal para la fecha en que se celebró la vista del caso de divorcio ante el foro de instancia, por lo que ciertamente no laboraba como abogado de Servicios Legales para esa fecha,* en el recurso que a esos efectos radicara en mayo de 1990 *adujo* que el foro de instancia había errado al designarle como abogado de oficio del señor Corraliza Rivera en el incidente sobre reclamación de alimentos, ya que el caso original de divorcio había sido tramitado por abogados de la oficina de Utuado de Servicios Legales, oficina en que él actualmente laboraba, *lo que planteaba un conflicto ético insalvable.*

Mediante Resolución de fecha 3 de mayo de 1990, una mayoría de los integrantes de este Foro, actuando "al amparo de la Regla 50 del Reglamento del Tribunal", ordenó la paralización de los procedimientos ante el tribunal de instancia hasta que otra cosa se dispusiera.(3) *Disentimos*

---

(2) Alegato de la Interventora Servicios Legales de Puerto Rico, Inc., pág. 4.

(3) Posteriormente, y mediante Resolución de fecha 3 de agosto de 1990, le concedimos término a Servicios Legales de Puerto Rico para que expresara "su posi-

en dicha ocasión. Hoy nos *reiteramos* en dicha posición. Veamos por qué.

## II

En el día de hoy —esto es, tres (3) años más tarde— el Tribunal resuelve que "la *previa* participación de *otros* abogados del Centro [de Utuado de Servicios Legales] ... *impide* que el licenciado Robles Sanabria *asuma ahora* la representación del señor Corraliza". (Énfasis suplido.) Opinión mayoritaria, págs. 743–744.

Dicha sorprendente, *y errónea*, determinación está predicada, curiosamente, en principios éticos correctos, los cuales realmente nadie puede refutar, a saber: que el abogado tiene para con su cliente un deber de lealtad completa; la obligación de ejercer un criterio profesional independiente en defensa de los intereses de su cliente; la obligación de no divulgar los secretos y confidencias que su cliente le haya expresado; la obligación de no aceptar la representación de asuntos en que puedan afectarse adversamente los intereses de otro cliente anterior; *constituyendo el objetivo principal de los principios antes expuestos el garantizar* "al cliente anterior que *las confidencias y los secretos que compartió con su abogado* en el transcurso de la primera representación *no serán utilizados en su contra* en representaciones posteriores". (Énfasis suplido.) Opinión mayoritaria, pág. 745. Véanse: *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778 (1984); Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.

Dichos principios, y la "garantía" antes mencionada, no hay duda, constituyeron el "fundamento principal" de la decisión que este Tribunal emitiera en *In re Orlando Roura*, 119 D.P.R. 1 (1987); caso en que expresamos, en lo pertinente, que "bajo el Canon 21 de Ética Profesional existe una insalvable incompatibilidad en que un abogado,

---

ción en relación con la petición presentada en el recurso de epígrafe".

que ha representado a ambas partes en un pleito de divorcio por consentimiento mutuo, intervenga y participe en esa condición en cualquier litigio posterior relacionado, directa o indirectamente, con las cuestiones objeto de dicho divorcio por consentimiento". Lo resuelto en ese caso, no hay duda, tiene el efecto de *impedir* que cualesquiera de los *tres* (3) abogados de la oficina de Utuado de Servicios Legales que, *efectiva y activamente,* participaron en la tramitación del caso de divorcio del matrimonio Pérez-Corraliza puedan intervenir en incidente alguno posterior en representación de los intereses individuales de dichas personas.(⁴)

Por otro lado, estamos igualmente contestes en que ninguno de los *otros* abogados que, para la fecha de la tramitación del referido caso de divorcio laboraban en dicha oficina de Utuado de Servicios Legales, y que, aun cuando no participaron activamente como abogados en el caso hubieran sido partícipes de alguna confidencia de las partes y/o adquirido alguna información privilegiada sobre el mismo, tampoco deben participar en incidentes posteriores relacionados a dicho caso; ello en virtud del mandato, *y espíritu,* del Canon 21 del Código de Ética Profesional, *supra.* Su no participación tendrá el efecto de evitar la *apariencia* de conducta impropia. *In re Rojas Lugo,* 114 D.P.R. 687 (1983); Canon 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.

### III

*Ahora bien,* ¿debe ser aplicada dicha prohibición —*en forma absoluta*— a un abogado que comenzó a laborar en la referida oficina *con posterioridad* a la fecha de tramita-

---

(⁴) Dicha norma, la cual suscribimos al implantarse la misma, fue establecida *a pesar de que* realmente nada de lo expresado o confiado por una de las partes al abogado común de ambas, *en presencia de la otra,* puede ser considerado como una "confidencia" que, posteriormente, pueda ser impropiamente utilizada por el abogado en contra de la parte que la enunció.

ción del caso *y que ni tan siquiera* había sido admitido a postular como tal por este Tribunal para la fecha en que se tramitó el caso en dicha oficina?

La mayoría del Tribunal, aplicando erróneamente la "doctrina sobre representación sucesiva adversa", contesta en la afirmativa. No obstante aceptar que la *"preocupación principal* en este tipo de caso es la protección del cliente contra el *uso adverso* de sus secretos y confidencias" —(énfasis suplido) opinión mayoritaria, pág. 751— y que, por lo tanto, la "causal de descalificación primaria es precisamente *el conocimiento* de tales confidencias por parte de uno o más de los abogados del bufete o agrupación" (íd.), razón por la cual *no* necesariamente procede la descalificación de todos los abogados, *el Tribunal resuelve* que debido a que los abogados de una oficina en particular de Servicios Legales "colaboran estrechamente" y "discuten entre sí" todos y cada uno de los casos que llegan a esa oficina, *se aplica en esta situación la modalidad de "presunción irrefutable de confidencias compartidas"*; razón por la cual *todos* los abogados de esa oficina —*presentes y futuros*— están impedidos de participar en los incidentes posteriores al caso en sí de divorcio.

Procede que se enfatice el hecho de que el establecimiento de dicha errónea norma está basado exclusivamente en la *alegada* estrecha colaboración, y discusión entre sí por parte de los abogados, de todos los casos de una oficina en particular; *dato que curiosamente ofrece Servicios Legales, parte con interés que, inclusive, ha solicitado del Tribunal que incluya en la prohibición ética, o descalifique, a todos los abogados de todas las treinta y dos (32) oficinas que tiene a través de toda la Isla de Puerto Rico de participar en el presente asunto.*

De entrada, corresponde señalar *que no debemos pecar de ingenuos.* Esta es una de esas ocasiones en que "[l]os jueces no debemos, después de todo, ser tan inocentes como para creer [cosas] que nadie más creería". *Pueblo v. Lu-*

*ciano Arroyo*, 83 D.P.R. 573, 582 (1961). Si bien la dinámica esbozada por Servicios Legales es la que, *teórica y utópicamente*, debería existir en toda oficina de Servicios Legales y la meta a que deberían aspirar todos los abogados que brindan servicios al indigente, *la realidad que se vive, desafortunadamente, es otra*.

Es un *hecho irrefutable* que Servicios Legales interviene anualmente en *miles de casos* de divorcio y de otra índole. *La carga de trabajo de sus abogados es abrumadora y casi humanamente imposible de llevar a cabo*.([5]) Si éstos continuamente se estuvieran reuniendo en grupo para consultar *todos* sus casos, en aras de planificar estrategias de litigio, *difícilmente contarían con tiempo suficiente para llevar pleito alguno ante los tribunales*. No creemos que persona alguna pueda tener duda sobre el hecho de que salvo contadas excepciones —en situaciones de casos complejos— *los abogados de Servicios Legales carecen de tiempo suficiente para reunirse y consultar sobre todos sus casos*. Ello tiene la consecuencia de impedir que, de ordinario, los abogados se enteren de las confidencias y secretos de los distintos clientes de Servicios Legales en los asuntos que ellos no manejan en forma personal y directa.

Aun aceptando, *a los fines de la argumentación*, que efectivamente los abogados de un centro de Servicios Legales continuamente discuten, y consultan entre sí, todos los casos que llegan a dicho centro, y si el propósito que se persigue es evitar que algún abogado del centro advenga en conocimiento de secretos y confidencias de algunas de las partes, ¿no debe ser aplicada la norma hoy establecida *únicamente* a los abogados que laboran en dicho centro *durante el periodo de tiempo* en el cual se tramita el caso en el mismo? ¿Por qué aplicar la norma al abogado que co-

---

([5]) En su alegato, Servicios Legales nos indica que entre 1987–1989 esta entidad atendió 257,355 "asuntos". Ello significa que en este lapso de tiempo cada uno de sus 215 abogados atendió aproximadamente 1,197 "asuntos".

mienza a laborar en dicha oficina *con posterioridad* al periodo de tiempo durante el cual se tramitó el caso?

Del expediente *no* surge con claridad si los tres (3) abogados que intervinieron en el caso de divorcio aún están laborando en el Centro de Utuado; situación que plantea la posibilidad, *aun cuando remota*, del intercambio de información relativa al caso entre los abogados de dicha oficina. Aun si partiéramos de la premisa de que ello es así, somos del criterio que la norma que establece la Opinión de Mayoría *es una extremadamente excesiva y abarcadora*, con funestas consecuencias para la clase indigente; la más necesitada de servicios legales gratuitos en Puerto Rico.

La normativa que hoy establece el Tribunal, en casos de esta naturaleza, es de correcta y entera aplicación en la situación de un bufete de abogados en la práctica privada de la profesión. Esa *no* es la situación en el presente caso; debemos *flexibilizar* dicha norma cuando se trata de agrupaciones de abogados como los de Servicios Legales. *Somos del criterio que en esta clase de situación, particular y especial, el Tribunal viene en la obligación de establecer un adecuado balance en protección de los intereses de las personas indigentes necesitadas de representación legal gratuita, sin afectar la disponibilidad de dichos servicios a los indigentes ni la confianza de nuestros ciudadanos en el sistema.*([6])

No nos podemos cegar y hacer caso omiso del hecho de que los indigentes *no* están en la misma posición de las personas que pueden pagar cómodamente por los servicios de abogados. Estos, de no poder ser representados por el abogado que anteriormente les atendió el caso, tienen la gran ventaja de poder acudir a la oficina de otro letrado. El necesitado, el indigente, si no puede recibir el servicio legal

---

([6]) Recuérdese que el fin de Servicios Legales es el de " 'promover la justicia para los insolventes económicos, facilitándoles servicios de abogado para garantizar la igual protección de las leyes y para alentar la fe en la justicia' ". *González v. Alicea, Dir. Soc. Asist. Legal,* 132 D.P.R. 638, 640 (1993).

gratuito que brinda Servicios Legales, está prácticamente condenado a tener que *mendigar* dicha asistencia.

Hay *remedios prácticos* que garantizan una *sana y ética* administración de la justicia. *Meramente a manera de ejemplo,* si en una situación como la de epígrafe un abogado de determinado centro de Servicios Legales es nombrado abogado de oficio por un tribunal y éste, al examinar el expediente, se percata que abogados que anteriormente trabajaron en su oficina intervinieron en un caso de divorcio por consentimiento mutuo, deberá informarlo de inmediato al tribunal y comunicarlo a su oficina de manera que el personal allí autorizado localice el expediente, lo selle y almacene bajo llave. De esta forma ese abogado *no* tendrá contacto alguno con información confidencial, notas y observaciones en el expediente que le pudiera ser adversa a una de las partes del pleito original. Deberá evitar dicho abogado, en adición, discutir los pormenores del caso con cualquier abogado que, por razón de haber estado laborando en el centro durante el periodo de tiempo en que se tramitó el caso, pueda tener conocimiento personal del mismo.[7]

De igual manera, si un cliente acude a un Centro de Servicios Legales para que le represente en una acción como la del caso de epígrafe, la persona que le entreviste deberá —en primer lugar— cerciorarse de que dicho Centro no haya estado envuelto en el pleito original entre las mismas partes. De contestar esta interrogante en la afirmativa, el abogado informará de inmediato este hecho al personal autorizado de esa oficina para que se asigne el caso a un abogado que no hubiera trabajado en dicha oficina durante la tramitación original del caso y/o no hubiera tenido contacto alguno con el mismo y se proceda a sellar y guardar bajo llave el expediente del caso en particular. De

---

[7] Ello a manera de una "muralla china", sobre lo cual este Tribunal se expresó en *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, 133 D.P.R. 112 (1993).

esta forma se evita que el abogado así designado advenga en conocimiento de confidencias y/o información privilegiada que cualquiera de las partes haya anteriormente revelado a abogados de dicho Centro; los cuales deberán abstenerse de compartir las mismas con el abogado designado.

Conforme a lo expresado, se *protege adecuadamente* al cliente y a la otra parte; se *cimenta la confianza* que éstos tienen en sus abogados; se promueve el *buen funcionamiento* del sistema adversativo de justicia *sin trastocar* la administración en los centros de servicios legales al indigente *y, sobre todo, no se le priva a un gran sector de nuestra sociedad de los servicios legales de los cuales, de ordinario, carecen y que les resulta difícil conseguir.*

La solución que para el problema "sugiere" la Mayoría —esto es, referir a estas personas indigentes a otros programas que proveen asistencia legal gratuita— *es más utópica que práctica.* Aparte del hecho de que en el caso particular ante nuestra consideración ello tendrá el efecto de posponer aún más el recibo de la pensión alimenticia por parte de la peticionaria Pérez Rivera y sus hijos, sabido es que dichas entidades no dan abasto con el trabajo que al presente tienen. Ello significa que difícilmente podrán absorber la carga de trabajo adicional que ahora se les impone. Ello así por cuanto la experiencia demuestra que la celebración, y vista en su fondo, del caso de divorcio en sí es el menor de los problemas.

Los *incidentes posteriores* a la vista en su fondo del caso de divorcio —relativos los mismos a solicitudes de alimento, desacato, rebaja o aumento de pensión, y relaciones paterno-filiales— son los que constituyen el verdadero "dolor de cabeza" para nuestros tribunales de instancia por lo *numerosas y frecuentes* que son dichas solicitudes; *incidentes para los cuales, conforme la norma establecida en el día de hoy por el Tribunal, difícilmente habrá disponible abogados para representar a las partes.*

## IV

Por último, no podemos pasar por alto el hecho de que la errónea norma que hoy establece el Tribunal en cuanto a los abogados de Servicios Legales tendrá, igualmente, unas consecuencias funestas sobre los servicios que prestan a los indigentes las Clínicas de Asistencia Legal de las tres (3) Escuelas de Derecho que existen en nuestro País. Debe recordarse que, como la veda que establece la norma mayoritaria es de carácter permanente, en el caso de las referidas Clínicas *una vez un estudiante de derecho entreviste a unos clientes, dicha Clínica estará impedida de realizar gestión alguna en el futuro relacionada con dicho asunto.*

Ello, naturalmente, debido a que se le puede imputar la información que le brinda el "cliente" al estudiante al *profesor* que le *supervisa*; profesor con el cual el estudiante *continuamente* consulta el caso. De la misma manera que, conforme a la Mayoría del Tribunal, el recibo de información privilegiada por parte de un abogado de una oficina de Servicios Legales *incapacita* al resto de los abogados, *presentes y futuros*, de dicha Oficina para participar posteriormente en cualquier asunto relacionado a dicho caso, la información que recibe un profesor de la Clínica de Asistencia Legal de un estudiante le es *imputable* a los otros profesores, *presentes y futuros*, de la Clínica.

*En vista de ello, la Clínica estará impedida en el futuro de atender cualquier asunto posterior relacionado al caso,* independientemente del hecho de que otro sea el profesor y sean otros los estudiantes envueltos. *Consideramos nuestro deber así señalarlo*; ello con el *propósito principal* de evitar que estos profesores incurran en el futuro, conforme la norma mayoritaria hoy implantada, *en violaciones a los cánones del Código de Ética Profesional por razón de conflicto de intereses.*

## V

En conclusión, la norma hoy implantada por el Tribunal *—la cual establece en esta clase de situaciones una veda o prohibición de índole eterna sin establecer límite alguno de carácter temporal o interpersonal—* tendrá *consecuencias nocivas inimaginables* sobre nuestro sistema de administración de justicia; *sobre todo para los menos afortunados que viven en nuestro País.*

La misma es una que no le hace favor a nadie. La acción de la Mayoría sólo puede ser explicada como el producto de un ejercicio *en abstracto* del poder inherente que tiene este Tribunal para reglamentar la profesión de abogado; ejercicios que, de ordinario, únicamente se llevan a cabo en laboratorios ya que los mismos no perjudican a persona alguna. Esa, *desafortunadamente*, no es la situación en el presente caso. *Es por ello que disentimos.*

**– O –**

Opinión disidente emitida por el Juez Asociado Señor Fuster Berlingeri.

El resultado al que llega la mayoría en este caso hará más difícil que antes la representación legal de indigentes en casos civiles, sobre todo en lugares de Puerto Rico donde no existen alternativas *reales* o *expeditas* a la asistencia que provee Servicios Legales de Puerto Rico, Inc. En la medida en que en el país existe un problema importante de representación legal de personas de escasos recursos, la decisión de la mayoría en este caso no facilita o adelanta la solución de ese problema, más bien le añade otro escollo, en mi criterio, innecesario.

La mayoría apoya su decisión en parte en lo que antes se había resuelto en *In re Orlando Roura*, 119 D.P.R. 1 (1987), caso en el que se dictaminó que un abogado que ha representado a ambas partes en un pleito de divorcio por

consentimiento mutuo no debe intervenir posteriormente como representante de alguna de las partes en otro litigio entre ellas relacionado con las cuestiones objeto de dicho divorcio. Este Tribunal llegó a esa decisión para hacer valer lo dispuesto en el Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, que en general prohíbe la representación de intereses encontrados. El dictamen de *In re Orlando Roura*, supra, probablemente respondió más que nada al celo de este Foro de evitar aun la *apariencia* de conducta impropia en el desempeño profesional. Si no fue así, dicha decisión es cuando menos un enigma porque no es comprensible que, por un lado, se prohíba siempre la representación posterior de una de las partes *sin requerir o comprobar que de hecho existan intereses encontrados* mientras que, por otro lado, se permite la representación inicial de *ambas* partes cuando deciden divorciarse. La conducta que el Canon 21 del Código de Ética Profesional, *supra*, prohíbe por antonomasia es precisamente que se pueda representar dos (2) clientes a la vez con intereses distintos. El ejemplo típico de lo que ese canon proscribe es la representación de ambas partes en un pleito contencioso. Sin embargo, en *In re Orlando Roura*, supra, *no vedamos que un abogado pudiese representar a ambos cónyuges en un divorcio por consentimiento mutuo.* No lo hicimos porque expresamente reconocimos que en tales casos "por imperativo lógico ... no hay partes adversas"; además, porque asumimos que en tales casos las conversaciones privadas del abogado con las partes no estaban afectadas por "diferencias irreconciliables de criterio". *Por lo tanto, si no hay partes adversas inicialmente, ¿cómo es que luego existe una presunción irrebatible de conflicto de intereses?* Si inicialmente no había intereses encontrados entre las partes ¿porqué se asume que posteriormente los habrá indudablemente? Para mí *In re Orlando Roura*, supra, apareja cierta contradicción o incongruencia, que sólo

puede entenderse si dicha decisión responde a una actitud de extrema prudencia, que busca esencialmente proteger la imagen de la profesión de la apariencia de conducta impropia.

Por otro lado, en el caso de marras la mayoría también apoya su decisión en parte en nuestra reciente decisión en *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, 133 D.P.R. 112 (1993), en la que resolvimos que en ciertas circunstancias procede la descalificación de todo un bufete si uno o más de sus integrantes está personalmente descalificado por razón de un conflicto de interés propio. El uso de esta decisión como precedente para asentar la decisión de la mayoría en este caso presenta aún más dificultades que el uso de *In re Orlando Roura*, supra. En *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra, se trataba de un bufete privado y no de una entidad como Servicios Legales, y la dinámica del ejercicio profesional es notablemente distinta entre unos y otros. Más importante aún, la situación en cuanto a la relación de los abogados con las partes es totalmente diferente aquí a la que existía en *P.R. Fuels, Inc. v. Empire Gas Co., Inc.*, supra. Para comenzar, en el caso ante nos ahora la selección del abogado cuya representación legal se cuestiona no la hizo el cliente de éste. El señor Corraliza no escogió a su abogado, calculando que le convenía contratar sus servicios por haber estado involucrado antes en asuntos relacionados con su pleito. Fue el tribunal de instancia quien le designó a Corraliza su representante legal como abogado de oficio.

En segundo lugar, no existe aquí una impugnación a la representación legal de una parte promovida por la parte contraria en el pleito, bajo una alegación de conflicto de interés. La señora Pérez no ha sido quien se ha opuesto a que el licenciado Robles represente a Corraliza. No ha habido tampoco un reclamo suyo de que puede haber confi-

dencias que proteger o que existe información que le dé una ventaja injusta al licenciado Robles.

En tercer lugar, no hay evidencia alguna de que el licenciado Robles tenga algún contacto real con el caso anterior que sea de naturaleza impeditiva. El licenciado Robles no tuvo una participación previa en el caso ni contacto alguno con las partes. No surge siquiera que el licenciado Robles trabajaba para Servicios Legales cuando el caso anterior fue atendido allí. Tampoco se ha alegado que éste hubiese discutido el caso con los abogados de Servicios Legales que tres (3) años antes atendieron el pleito de divorcio.

Finalmente, no hay evidencia o alegación alguna de que en el pleito inicial de divorcio las partes sostuvieran discusiones con sus abogados de entonces que fueran de naturaleza privilegiada. No hay nada que sugiera que dicho divorcio por consentimiento mutuo fuese algo más que un pleito *ex parte* rutinario.

En resumen, pues, no están presentes aquí las circunstancias usuales que apuntan hacia un *insalvable conflicto de intereses*, que requieran aplicar inexorablemente el rigor del Canon 21 del Código de Ética Profesional, *supra*. No estamos ante una situación en la que exista un riesgo real de que abogados claramente descalificados por la información privilegiada que poseen puedan burlar o estén tentados a burlar su descalificación por medio de otros abogados compañeros de bufete que no están igualmente descalificados. Difícilmente caben en este caso unas presunciones razonables de confidencias compartidas. No existen fundamentos concretos de divulgación indebida que requieran la descalificación de todos los abogados de la oficina de Servicios Legales de Utuado.

La acción de la mayoría aquí es el producto de una discusión y aplicación de principios *in abstracto*. Por correctas que sean las disquisiciones de la mayoría, no dejan de ser conceptualizaciones desconectadas de la realidad concreta que, además, resultan en un dictamen algo ajeno a las sen-

sibles necesidades de tantos en el país que pueden, en términos prácticos, quedar desprovistos de representación legal.

Para mí siguen siendo válidas algunas de las expresiones de los Jueces Negrón García y Rebollo López cuando este recurso vino ante nos por primera vez. Como dijeran en su voto disidente preliminar de 3 de mayo de 1990:

> En estas circunstancias no podemos coincidir con el sentir mayoritario expresado en la sentencia que hoy emite este Tribunal, porque automáticamente descalifica *pro tempore* al licenciado Robles Sanabria y a todos los integrantes de la oficina local de Servicios Legales de Utuado. Esa decisión es drástica y opera en el vacío. Coloca al señor Corraliza Rivera en la difícil situación de tener que acudir a otra oficina de Servicios Legales, gestionar asistencia profesional en una entidad distinta o contratar un abogado de la práctica privada.
>
> Si la situación y las alternativas planteadas fueran únicas, quizás las consecuencias serían mínimas. Pero cuando proyectamos la determinación de este Tribunal a través de toda la isla, advertimos claramente los efectos negativos y perjudiciales que tendría en los importantes servicios que presta Servicios Legales de Puerto Rico, Inc. Además, el impacto económico y administrativo incide en la calidad de asistencia legal rápida. Aflora de inmediato un costo social y espiritual impermisible.
>
> Nos explicamos. La opción de que en casos similares el Tribunal designe de oficio a abogados de la práctica privada retribuida, presumiblemente de la localidad, no supera el problema que surgiría cuando el ciudadano pobre acuda, en calidad de reclamante, en búsqueda de orientación, asesoramiento y representación a la oficina local de la Corporación de Servicios Legales de Puerto Rico y le sean negados esos servicios por el solo hecho de que la entidad anteriormente lo representó en un caso de divorcio por consentimiento mutuo. ¿Cuál sería entonces el trámite? ¿Acudir *ex parte* al Tribunal para que, sin existir todavía una acción judicial, le designe de oficio un abogado de la práctica privada retribuida? ¿Referirlo al Procurador de Relaciones de Familia? Ante el número sustancial de esta litigación, ¿no estaríamos sobrecargando indebidamente las funciones de este último funcionario?
>
> Frente a la disyuntiva planteada, descartamos la tesis mayoritaria de descualificación automática fundada en el "criterio corporativo común" o "un solo bufete continuo". Esa norma no debería extenderse incondicionalmente a Servicios Legales de Puerto Rico, Inc. y a sus oficinas locales. La calificaríamos a los

efectos de hacerla extensiva únicamente, como *norma individual*, a los abogados que confrontan alguna de las situaciones siguientes: han brindado asesoramiento directo en el caso previo; han intervenido en un proceso judicial anterior; han suscrito documentos ante los tribunales; han adquirido conocimiento real previo en el desempeño de sus cargos o posteriormente advienen en contacto con información de naturaleza privilegiada no accesible de otro modo. Más allá de estas situaciones, no existe razón alguna para aplicar rigurosamente, y en abstracto, el Canon 21 del Código de Ética Profesional, *supra*, y nuestra jurisprudencia interpretativa. (Énfasis en el original.) *Robles Sanabria, Ex parte*, 126 D.P.R. 382, 386-387 (1990).