PUERTO RICO FUELS, INC., demandante y peticionaria, *v.* EMPIRE GAS COMPANY, INC., demandada y recurrida.

*Número:* CE-90-796          *Resuelto:* 14 de abril de 1993

*William Estrella López De Victoria* y *Eric Álvarez Feliciano*, de *William Estrella Law Offices, Andrés E. Salas Soler* y *Guillermo De Guzmán Vendrell*, de *Cancio, Nadal & Rivera*, abogados de la parte demandante y peticionaria; *Manuel Fernández Mejías*, abogado de la parte codemandada y recurrida Empire Gas Company, Inc.; *Rebeca F. Rojas* y *Héctor Reichard De Cardona*, de *Lasa, Escalera & Reichard*, abogados de la parte codemandada y recurrida Tropigas de Puerto Rico; *Ramón E. Dapena*, de *Brown Newson & Córdova*, abogado de la parte codemandada y recurrida Progasco, Inc.; *Luis E. Gervitz Carbonell*, de *Gervitz & Barrios*, abogado de la parte codemandada y recurrida Carlos Declet Jiménez, Santurce Gas, Inc. y la Asociación de Distribuidores de Petróleo de Gas Licuado de Puerto Rico, Inc.; *Carlos Declet Jiménez, pro se*, y abogado de la parte codemandada y recurrida Santurce Gas, Inc. y la Asociación de Distribuidores de Gas Petróleo de Puerto Rico, Inc.; *Susana Cortina de Cárdenas*, en comparecencia especial; *José M. Sagardía Pérez*, Presidente del Colegio de Abogados de Puerto Rico, *Antonio Arraiza Miranda*, Presidente de la Comisión de Ética, y *Mady Pacheco García de la Noceda*, Oficial Investigador, en calidad de *amicii curiae; Jorge E. Pérez Díaz, Procurador General*, y *Silvia A. Cancio Bigas, Procuradora General Auxiliar*, en calidad de *amicii curiae*.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

Existe una íntima correlación entre nuestro sistema de vida democrático y la fe en la justicia. Los cánones de ética profesional son los *mandamientos mínimos* que concreti-

zan la conducta que la sociedad espera de los abogados. No son, pues, meramente una lista de normas vacías. Enmarcan un concepto del deber muy profundo y abarcador; aquel que penetra la dimensión de la conciencia, de lo moral. "El deber es el freno de la conciencia. Sin él, la conciencia se desboca. Ya la estimule el instinto capitaneando la legión de necesidades que él concita y que lo excitan, ya la espolee el egoísmo con el aguijón de la utilidad y la pasión; ya la persuadan o la engañen la sensibilidad y la imaginación, aunque el generoso derecho la impulse, la conciencia individual estaría desenfrenada sin descanso y desviada sin remisión, si el deber no pudiera dirigirla." E.M. De Hostos, *Obras Completas, Tratado de Moral*, Vol. XVI, 1939, pág. 134.

# I

El 19 de julio de 1987, Puerto Rico Fuels, Inc. (P.R. Fuels), Tropigas de Puerto Rico, Inc. (Tropigas), Inc. y otros, presentaron en el Tribunal Superior, Sala de San Juan, una demanda en daños y perjuicios contra Empire Gas, Co. (Empire) y otros por alegada violación a nuestras leyes de monopolios. Después de varios incidentes procesales, P.R. Fuels solicitó que dejáramos sin efecto una orden de dicho tribunal (Hon. Evaristo M. Orengo, Juez) que paralizó los procedimientos hasta la culminación de unos casos criminales contra algunos demandados. Además, permitió por sesenta (60) días el descubrimiento de prueba mediante deposiciones, con miras a dar una oportunidad a *Empire* y a *Tropigas* de proveerse de elementos de juicio adicionales para oponerse a una moción de sentencia sumaria presentada por P.R. Fuels.

Oportunamente, la demandante *Empire* se opuso. Por su parte, *Tropigas* argumentó la existencia de un conflicto de intereses en la representación legal de P.R. Fuels que le perjudicaba decisiva y adversamente. Pidió que descalifi-

cáramos al Bufete de William Estrella (Bufete de Estrella) y al Lcdo. Andrés Salas Soler. Adujo que el conflicto se configuró desde el momento en que la Lcda. Susana Cortina de Cárdenas —quien antes fuera, *en este caso*, su representante legal junto al Lcdo. Héctor Reichard, mientras ejerció funciones de abogada asociada en el *Bufete de Lasa, Escalera y Reichard* (Bufete Lasa)— comenzó a laborar en el Bufete de Estrella, representante de P.R. Fuels.

Específicamente planteó que la licenciada Cortina de Cárdenas, al empezar a trabajar en el *Bufete Lasa* en noviembre de 1989, participó activamente en la representación de Tropigas, y en el desempeño de sus funciones profesionales *obtuvo información confidencial*.

Aunque los abogados de P.R. Fuels lo aceptan, aducen que al momento de la licenciada Cortina de Cárdenas iniciar funciones tomaron las providencias necesarias en el *Bufete de Estrella* para evitar que se divulgara cualquier información obtenida mientras ella trabajó para el *Bufete Lasa* en relación con Tropigas, y así aislarla "de este caso". En contrario, Tropigas nos presentó una lista de las intervenciones de la licenciada Cortina de Cárdenas en el *presente caso*, como su representante, que incluyen: conversaciones directas con el cliente, investigación y preparación de memorandos de derecho relacionados con la representación de Tropigas en el caso de epígrafe; discusión interna del presente caso con el licenciado Reichard; argumentación de mociones, y comparecencia a deposiciones y ante el tribunal en representación de Tropigas.[1]

---

[1] La licenciada Cortina de Cárdenas con absoluta honestidad admite que mientras laboró en el Bufete de *Lasa* también tuvo a cargo los asuntos "relacionados con Tropigas, y, en particular, con el caso de epígrafe". No obstante, en síntesis expone que no procede la descalificación por las razones siguientes: (1) al aceptar trabajar luego con la firma legal del licenciado Estrella, acordó con éste que no participaría, conocería ni discutiría asunto alguno de Tropigas; (2) ha observado invariablemente ese acuerdo y no ha participado en este otro caso; (3) los cánones lo único que prohíben es representar intereses encontrados simultáneamente; (4) su descalificación afectaría sustancial y gravemente la práctica de bufetes especializados en la fase del reclutamiento, y (5) también menoscabaría el derecho del abogado

Efectivamente, surge que el 30 de junio de 1990 la licenciada Cortina de Cárdenas renunció a su posición en el *Bufete Lasa* y, transcurridos varios meses, aceptó y comenzó a trabajar en el Bufete de Estrella. Dicho bufete, integrado en ese momento por cuatro (4) abogados, ha compartido la representación legal de P.R. Fuels junto al licenciado Salas Soler. La petición de descalificación de Tropigas va dirigida a impedirle la utilización de información confidencial relacionada con la defensa de Tropigas, divulgada o que pudo ser divulgada por la licenciada Cortina de Cárdenas, mientras trabajó para el licenciado Estrella. Además, Tropigas argumenta que debe descalificarse al licenciado Salas Soler, quien a pesar de tener oficinas separadas, en unión al licenciado Estrella es responsable de la representación de P.R. Fuels y protege sus intereses.

A su vez, el Bufete de Estrella y la licenciada Cortina de Cárdenas arguyen que en ningún momento hubo divulgación·de información; que no se debe presumir que la información de conocimiento de la licenciada Cortina de Cárdenas sobre las defensas de Tropigas fueron compartidas; que tanto ella como el licenciado Estrella, *con conocimiento del posible conflicto de intereses*, tomaron los pasos para aislarse del litigio acorde con la *doctrina de la muralla china (Chinese Wall)* y que el Bufete de Estrella contrató a la licenciada Cortina de Cárdenas sólo para atender casos de derecho ambiental por su conocimiento especializado en dicho campo. En resumen, ambos, al igual que el licenciado Salas Soler, rechazan violación alguna de los cánones de ética profesional.

Lo delicado del planteamiento ha producido extensas comparecencias, alegatos, réplicas, dúplicas y, además, memoriales del Procurador General de Puerto Rico y del Colegio de Abogados de Puerto Rico, ambos en calidad de

a conseguir trabajo. Señala, además, que afectaría negativamente en cuanto al costo que tendrían que satisfacer los clientes.

118

*amicii curiae.*(²) En recta técnica adjudicativa, circunscribimos nuestros pronunciamientos a los hechos específicos de este recurso, reconociendo la multidimensionalidad de la *doctrina de la muralla china.*

## II

Es un hecho no contradicho que la licenciada Cortina de Cárdenas participó activamente en la representación de Tropigas en el *Bufete Lasa* (y al poco tiempo de renunciar, comenzó en el *Bufete de Estrella),* representantes legales de la peticionaria P.R. Fuels. No se cuestiona seriamente el impedimento *absoluto* que, a priori, pesa sobre ella.

El Canon 21 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, dispone categóricamente que "el abogado tiene para con su cliente un deber de lealtad completa". *In re Belén Trujillo,* 126 D.P.R. 743 (1990). La obligación de representar con fidelidad incluye no divulgar secretos o confidencias y adoptar medidas adecuadas para evitar su divulgación. En consecuencia, no puede aceptarse la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de uno anterior; independientemente de que ambos clientes lo aprueben. *In re Belén Trujillo,* supra; *In re Guzmán,* 80 D.P.R. 713, 724 (1958). Así, pues, el Canon 21, *supra,* prohíbe fuera de toda duda tanto la representación concurrente como la sucesiva siempre que exista, en esta última, una "relación sustancial" entre el asunto anterior y el posterior que implique

---

(²) El 22 de julio de 1991, la licenciada Cortina de Cárdenas nos informó que por razones de enfermedad familiar cesó el 15 de julio de trabajar en dicho bufete y se trasladó temporeramente al estado de Florida. Subsiguientemente acreditó nueva dirección en Puerto Rico.

El 15 de julio de 1992, el Bufete de William Estrella renunció a la representación de P.R. Fuels, Gas del Pueblo, Inc. y Norvest, Ltd.

Estas circunstancias no han tornado académicos nuestros pronunciamientos ya que pende ante nos si procede la descalificación del licenciado Salas Soler, quien continuó como abogado.

intereses adversos. "Bajo esta fórmula [en relación a la representación sucesiva], el cliente sólo tiene que demostrar que la controversia legal envuelta en el pleito en la que el abogado comparece en su contra estaba sustancialmente relacionada con la materia o causa de acción en la que tal abogado previamente le representó. El cliente no tiene que probar que de hecho ocurrió una violación de hecho al principio de confidencialidad. Sólo se requiere una relación previa de abogado y cliente y que tal representación resulte adversa y esté sustancialmente relacionada con la anterior." *In re Carreras Rovira y Suárez Zayas*, 115 D.P.R. 778, 791–792 (1984).

En resumen, el Canon 21, *supra*, veda la representación legal si existe alguna posibilidad de conflicto de intereses. *In re Carreras Rovira y Suárez Zayas*, supra. El criterio para detectarlo es si al abogado representar los intereses de un cliente en un caso, la representación posterior de otro cliente en uno relacionado sustancialmente con el primero puede entenderse como un cambio de lado.

### III

Ahora bien, ¿se extiende la descalificación de la licenciada Cortina de Cárdenas a toda la representación (Bufete de Estrella) de P.R. Fuels?

La respuesta a esta interrogante requiere que examinemos las normas de descalificación *imputada*. Se denomina generalmente "descalificación imputada o vicaria" aquella que recae sobre un bufete completo o un grupo de abogados debido a la descalificación de uno o más de sus miembros por razón de conflicto de intereses. *ABA/BNA Lawyers' Manual on Professional Conduct* Sec. 751:2003 (1992). Nuestro Código de Ética considera expresamente, en su preámbulo, que "[e]stará vedado al abogado violar los

presentes cánones aun por medios indirectos o mediante el empleo de terceros".(³) 4 L.P.R.A. Ap. IX.

Elaborar una norma precisa sobre descalificación *imputada* presenta serias dificultades, ya que ello implica una serie de intereses que deben sopesarse y que están presentes en contextos muy diversos. 1 *Hazard and Hodes, The Law of Lawyering* Sec. 1.10:103 (Supp. 1992). Los intereses primordiales lo constituyen la protección de las confidencias del cliente y el ejercicio de un criterio profesional independiente, pero no puede menospreciarse los intereses que compiten con éstos: la movilidad de los abogados en el mercado de empleos y los posibles efectos perjudiciales para la parte cuyo abogado es descalificado. *Hazard and Hodes*, supra.(⁴)

■ Las normas sobre descalificación *imputada* están apuntaladas en supuestos de sentido común y en la experiencia de cómo trabajan los abogados que ejercen en bufetes y los motivos que le llevan a compartir información y a aunar esfuerzos. Wolfram, *Modern Legal Ethics*, pág. 391 (Practitioner's ed. 1986).(⁵) En los casos de representación

(³) Así, nuestro Código de Ética Profesional recoge un principio similar al plasmado en la regla disciplinaria 5-105(D) del *Model Code of Professional Responsibility and Code of Judicial Conduct*, ABA Press, 1986, sobre la descalificación imputada. Dispone:

"(D) Si a un abogado se le requiere de acuerdo con una regla disciplinaria declinar o retirarse de un empleo, ningún socio o asociado, o abogado afiliado a él o a su bufete podrá aceptar o continuar en dicho empleo." (Traducción nuestra.) *Annotated Code of Professional Responsibility*, Chicago, American Bar Foundation, 1979, pág. 246.

(⁴) Una moción de descalificación exitosa priva a la parte del abogado de su preferencia y le obliga a buscar un sustituto. Para poder cumplir con su encomienda, el nuevo abogado tiene que alcanzar el mismo grado de conocimiento de los pormenores de litigio que poseía el abogado descalificado. En litigios complejos o en los cuales ha trancurrido mucho tiempo desde sus comienzos, esta labor es difícil y puede ser imposible. L.A. Winslow, *Federal Courts and Attorney Disqualification Motions: A Realistic Approach to Conflicts of Interest*, 62 (Núm.4) Washington L.Rev. 863, 872 (1987).

(⁵) En *In re Lavastida et al.*, 109 D.P.R. 45, 91–92 (1979), la opinión concurrente y disidente recogió algunos de estos supuestos al expresar:

"... no podemos olvidar las siguientes características peculiares de una sociedad de abogados que afectan los principios de deontología profesional: (a) se presume que la información confidencial de un cliente a un socio es conocida y compartida por los

sucesiva adversa, estos supuestos los recoge lo que tradicionalmente se denomina *presunción de confidencias compartidas.*

■ Cuando un abogado cambia de bufete, *la presunción de confidencias compartidas* comprende dos (2) modalidades que pueden o no operar simultáneamente: (1) que el abogado tuvo acceso a información confidencial en el bufete de donde provino y/o (2) que el abogado va compartir esa información en el nuevo bufete. Véanse: L. Gilbert y G. Zadorozny, *Serving Two Masters: The Law of Lawyer Disqualification,* Section Of General Practice American Bar Association, págs. 26–27 (1984); D.R. McMinn, *ABA Formal Opinion 88-356: New Justification For Increased Use of Screening Devices To Avert Attorney Disqualification,* 65 (Núm. 5) N.Y.U. L. Rev. 1231, 1250–1251 y 1254 (1990).[6]

El caso ante nos no cae bajo la presunción en su primera modalidad, por lo que es innecesario resolver si ésta es rebatible.[7] Según señaláramos, la licenciada Cortina de Cárdenas participó *activamente* en la representación de Tropigas mientras trabajó en el Bufete Lasa. Su impedimento no responde a una imputación de conocimiento de las confidencias del cliente en manos de los otros abogados en ese bufete, sino al conocimiento de confidencias del

---

restantes socios ... (c) la sociedad constituye una asociación donde la comunicación, cooperación y el intercambio del conocimiento e ideas, es común y necesario ...."

[6] En casos donde operan las dos (2) modalidades de la presunción, y respondiendo a su visión de que ambas son rebatibles, la Corte de Apelaciones de Estados Unidos para el Séptimo Circuito ha desarrollado un método de análisis que consta de tres (3) pasos. El primero consiste en determinar si existe una relación sustancial entre el asunto de la representación anterior y el de la posterior. Si existe tal relación, procede continuar al segundo: determinar si la presunción de confidencias compartidas en torno a la representación anterior fue refutada. Finalmente, si la presunción de confidencias compartidas no se rebatió en cuanto a la representación anterior, se examina si se rebatió en cuanto a la representación posterior. *Schiessle v. Stephens,* 717 F.2d 417 (7mo Cir. 1983); ABA/BNA, *supra,* Sec. 751:2010; *Annotated Model Rules of Professional Conduct,* 2da ed., American Bar Association, 1992, pág. 185.

[7] La norma tradicional es que ambas modalidades de la presunción de confidencias compartidas son irrebatibles. Véase *Developments in the Law: Conflicts of Interest in the Legal Profession,* 94 Harv. L. Rev. 1244, 1355 y 1361 (1981).

cliente por estar involucrado directa y personalmente en la referida representación.(⁸)

Aclarado este extremo, consideremos, antes de determinar si procede la descalificación del Bufete de Estrella, si la *presunción de confidencias compartidas* es rebatible en su segunda modalidad: que el abogado va a compartirla con el nuevo bufete. Precisamente, la *defensa de la muralla china* que el Bufete de Estrella levanta va dirigida a rebatir la presunción en esta modalidad.

## IV

■ La *defensa de la muralla china* consiste en establecer una serie de prácticas o procedimientos con el propósito de canalizar el flujo de información dentro de un bufete, de suerte que se proteja su confidencialidad y se salven situaciones de conflicto de intereses. McMinn, *supra*, pág. 1233; Comentario, *The Chinese Wall Defense to Law–Firm Disqualification*, 128 (Núm. 3) U. Pa. L. Rev. 677–678 (1980); Gilbert and Zadorozny, *supra*, pág. 34. El propósito es crear una barrera que aísle al abogado "contaminado" por una representación previa, permitiendo así que los otros miembros del bufete puedan continuar una

---

(⁸) Debido al grado de participación de la licenciada Cortina de Cárdenas en los asuntos de Tropigas mientras trabajaba en el Bufete Lasa, no hemos enfocado el problema de su descalificación (en la parte II de esta opinión) como uno de descalificación imputada por razón de su asociación previa con ese bufete, sino desde la perspectiva de un abogado individual que representa sucesivamente intereses adversos. Es por ello que entendemos que no opera en este caso la presunción de confidencias compartidas en su primera modalidad.

Algunas cortes han permitido rebatir la presunción de confidencias compartidas en su primera modalidad mediante la aplicación de la doctrina de la representación periférica (*peripheral representation exception*) que surgió de la opinión de la Corte de Apelaciones para el Segundo Circuito en *Silver Chrysler Plymouth, Inc. v. Chrysler Mot. Corp.*, 518 F.2d 751 (2do Cir. 1975). D.R. McMinn, *ABA Formal Opinion 88-356: New Justification For Increase Use of Screening Devices To Avert Attorney Disqualification*, 65 (Núm. 5) N.Y.U. L. Rev. 1231, 1252 (1990); Wolfram, *Modern Legal Ethics*, págs. 399–401 (1986). El abogado puede rebatir la presunción de confidencias compartidas probando que, como cuestión de hecho y debido a la naturaleza del trabajo que desempeñó en el bufete con el cual estaba asociado previamente, no tiene conocimiento de información confidencial. McMinn, *supra*.

representación que está sujeta a ser cuestionada mediante un planteamiento de conflicto de intereses. *Developments in the Law: Conflicts of Interest in The Legal Profession*, 94 Harv. L. Rev. 1244, 1367. Ejemplos de prácticas que pueden constituir una muralla china son: (1) prohibirle al abogado contaminado tener alguna relación con el caso o de participar en las ganancias; (2) vedarle discusiones relevantes con el abogado contaminado; (3) prohibir la transferencia de documentos relevantes de o al abogado contaminado; (4) restringir el acceso a los expedientes; (5) educar a todos los miembros del bufete sobre la importancia de la muralla, y (6) separar, tanto física como organizacionalmente, los abogados que trabajan en asuntos en conflicto. Comentario, *supra*, pág. 678.

A pesar de que algunas cortes estatales y federales han reconocido la doctrina, especialmente en casos en que el abogado en cuestión trabajaba para el Gobierno, ninguno ha adoptado una norma o diseño de la "muralla china".[9] La mayoría se muestra renuente a aceptar algún diseño particular de "muralla china" como garantía suficiente contra un conflicto de intereses. *In Defense of a Double Standard in the Rules Of Ethics: A Critical Reevaluation of the Chinese Wall Defense & Vicarious Disqualification*, 20 Journal of Law Reform 245, 265 (1986); McMinn, *supra*, pág. 1258.[10]

---

[9] En 1975 la American Bar Association emitió una opinión endosando el uso de la muralla china en casos de abogados provenientes del Gobierno. Dicho endoso se fundó en la necesidad del Gobierno de atraer profesionales jóvenes y abogados competentes a su servicio. De acuerdo con el comité que emitió la opinión, no se debía de interferir con la habilidad del Gobierno para reclutar abogados requiriéndoles que se expusiesen a grandes limitaciones sobre su práctica futura. ABA Formal Opinion 342, citada en *Serving Two Masters,* supra, págs. 34–36. La Regla 1.11 de los *Model Rules of Professional Conduct* endosa expresamente el uso de la defensa en casos de abogados que provienen del Gobierno. *Annotated Model Rules of Professional Conduct, op. cit.*, pág. 188.

[10] No obstante este dato, algunas de las fuentes consultadas enumeran una serie de elementos recopilados de la jurisprudencia cuya presencia propende a un planteamiento exitoso de la defensa. La enumeración más extensa comprende los factores siguientes: (1) la sustancialidad de la relación entre el caso anterior y el posterior; (2) el tiempo transcurrido entre los casos; (3) el tamaño del bufete (se

El argumento principal a favor de la defensa es que permite relajar las normas sobre descalificación imputada, mientras se protegen los intereses antes mencionados que compiten con la expectativa de confidencialidad a que tienen derecho los clientes sin menoscabar esta última. *Developments in the Law: Conflicts of Interest in the Legal Profession*, supra, págs. 1365–1366.

Varios son los argumentos que militan contra el reconocimiento de la defensa. *Primero*, los mecanismos de aislamiento sólo protegen contra la transferencia de información inconsciente o involuntaria por lo que su eficacia depende del deseo de cooperación de los abogados. McMinn, *supra*, pág. 1255. *Segundo*, cuando los abogados pertenecen a un mismo bufete, existen poderosos incentivos (debido a los lazos económicos, sentimentales, hegemónicos) para indagar sobre las confidencias o para que quien las posea las divulgue: un abogado inescrupuloso podría envolver al abogado "contaminado" en conversaciones reveladoras y valerse de mecanismos subrepticios para ganar acceso a los expedientes. *Developments in the Law: Conflicts of Interest in the Legal Profession*, supra, págs. 1362–1363. *Tercero*, si se permitiera la defensa, la parte que solicitase la descalificación tendría que refutar la evidencia presentada por el bufete de que se construyó una muralla eficaz y que no se revelaron la confidencias. Esto podría conllevar que el cliente se viese obligado a divulgar la confidencias que precisamente se pretende proteger. McMinn, *supra*, pág. 1275.

■    Frente a estas distintas razones —algunas de

---

estima que es más realista la presunción de confidencias compartidas en los bufetes pequeños que en los grandes); (4) el número de abogados descalificados (es más fácil aislar un número pequeño de abogados); (5) la naturaleza de la esta participación del abogado descalificado (el grado de participación del abogado en el caso anterior incide sobre el grado del perjuicio posible); (6) el momento en que se instituye la muralla (una muralla creada tan pronto surge el potencial de conflicto tiene mayores posibilidades de éxito que una creada luego), y (7) las características de la muralla. Comentario, *supra*, págs. 712–713. Véase, además, *Annotated Model Rules of Professional Conduct, op. cit.*, pág. 188.

peso, otras no— trazar la ruta decisoria no ha sido fácil. Como jueces vivimos insertos en la sociedad y no podemos ignorar muchas de las críticas que se hacen a nuestra profesión. A la postre, ha influido en nuestra conciencia judicial la visión de que la abogacía presupone adherirse a las más estrictas normas éticas y morales. *En el trasfondo fáctico del caso de autos, no es menester resolver si vamos o no a incorporar a nuestro ordenamiento la defensa de la muralla china.* Según expusimos, la licenciada Cortina de Cárdenas representó a Tropigas mientras laboraba en el *Bufete Lasa.* En esa encomienda obtuvo información confidencial. Su traslado poco tiempo después al Bufete de Estrella —de tamaño reducido— dificulta, por no decir impide, la posibilidad real de implantar cualquier barrera adecuada de aislamiento que satisfaga las normas de ética profesional en cuestión.

## IV

Nos resta determinar si la descalificación del Bufete de Estrella conlleva automáticamente la del licenciado Salas Soler. Una mayoría de los tribunales que han enfrentado el problema de la descalificación imputada de un co-representante han rehusado establecer una presunción de confidencias compartidas entre coabogados. Véanse, a manera de ejemplo: *Fred Weber, Inc. v. Shell Oil Co.*, 566 F.2d 602 (8vo Cir.), *cert.* denegado, 436 U.S. 905 (1977); *Akerly v. Red Barn System, Inc.*, 551 F.2d 539 (3er Cir. 1977), citados en *Annotated Model Rules of Professional Conduct*, American Bar Association, 1992, pág. 181. Ello responde a una preocupación por delimitar el alcance de las doctrina de descalificación imputada. *Annotated Model Rules of Professional Conduct, op. cit.*, pág. 182. Sin embargo, como han observado algunos comentaristas, ese enfoque subestima los riesgos que puede presentar esta relación:

... quienes tienen experiencia en el ejercicio de la profesión es-

tán al tanto de que coabogados unidos contra un oponente en común pueden tener un incentivo marcado para compartir toda la información pertinente para el caso. El potencial para usar indebidamente información confidencial entre coabogados puede ser mayor que entre los miembros de un mismo bufete. (Traducción nuestra.) P.R. Taskier y A.H. Casper, *Vicarious Disqualification of Co–Counsel because of "Taint"*, 1 Geo. J. Legal Ethics 155, 160 (1987–1988).

Aunque reconocemos que la naturaleza de la relación entre coabogados puede variar, dependiendo de la situación fáctica de que se trate, compartimos este último enfoque. Véase Wolfram, *op. cit.*, págs. 396–397. En consecuencia, resolvemos que existe una presunción *rebatible* de *confidencias compartidas* entre coabogados que se activa una vez la parte promovente de la moción de descalificación presenta evidencia de que uno de los coabogados está involucrado en una situación de conflicto de intereses. La parte que se oponga a la moción deberá presentar evidencia que demuestre que la relación entre los coabogados no sostiene la presunción. La descalificación procederá de no rebatirse la presunción.

En este caso hemos visto que el Bufete de Estrella se ha involucrado en una insalvable situación de conflicto de intereses. El licenciado Salas Soler, quien cuenta con un bufete independiente, compareció como representante legal junto con el licenciado Estrella desde el inicio de la demanda el 19 de junio de 1987. Ante este cuadro, concluimos que aquí se ha activado una *presunción de confidencias compartidas* entre el Bufete de Estrella y el licenciado Salas Soler, y que a este último debe concedérsele la oportunidad de exponer y ampliar su posición en el foro de instancia, si interesa rebatirla.

Ninguno de estos pronunciamientos deben estimarse como una sanción por infracción ética al amparo de los cánones de ética profesional.

*Se dictará la correspondiente sentencia.*

La Juez Asociada Señora Naveira de Rodón y el Juez Asociado Señor Fuster Berlingeri concurrieron con el resultado sin opinión escrita. El Juez Presidente Señor Andréu García no intervino.