*612 TEXTO COMPLETO DE LA SENTENCIA
El 28 de abril de 2005, General Motors Overseas Distribution Corporation (“GMODC’) y General Motors Corporation (“GM”) presentaron un escrito de Certiorari ante este Tribunal en el que solicitaron la revisión de la Resolución emitida el 14 de marzo de 2005, notificada el 29 de marzo de 2005, por el Tribunal de Primera Instancia, Sala Superior de San Juan (“TPF’), en el caso Alberic Colón Auto Sales, Inc. et als. v. General Motors Overseas Distribution Corp. et al., Civil Número KAC97-0854, sobre incumplimiento de contrato y daños. Mediante la referida decisión, el TPI declaró Sin Lugar la Objeción al Amparo de la Regla 41 a Resolución del Comisionado Especial, presentada por GMODC y GM, y aprobó, incorporó e hizo suyo de forma íntegra la determinación del Comisionado Especial, Ledo. Wilfredo Alicea López, de fecha de 27 de septiembre de 2004, según reiterada por éste en Resolución del 18 de noviembre de 2004, declarando Sin Lugar la solicitud de descalificación contra la Leda. Emma Sara Pórtela (“Leda. Pórtela”).
I
El pleito de epígrafe fue presentado el 22 de agosto de 1997 por los co-demandantes y aquí recurridos, Alberic Colón Auto Sales, Inc., Barranquitas Auto Corp., C.R. Rondinelli, Inc., Cabrera Hermanos, Inc., Losada Auto Truck, Inc., Lugo Auto Sales, Inc. y Royal Motors Corp., concesionarios todos de los vehículos de motor General Motors en Puerto Rico (“Concesionarios”), contra los co-demandados y aquí peticionarios, GMODC y GM, sobre incumplimientos a lo dispuesto en los respectivos contratos de ventas y servicios otorgados entre las partes, conocidos como “Dealers Sales and Service Agreements” (“Contratos de Distribución”). Dichas pretensiones habían sido presentadas hasta entonces por reclamaciones extrajudiciales mediante cartas realizadas en conjunto por los Concesionarios bajo el nombre de la asociación no incorporada “General Motors Dealers Association ”, t/c/p/ GMDA o Asociación de Dealers General Motors de Puerto Rico. (Alegato de la Parte Recurrida, Anejos Núms. 2, 10-12, 14, 16-18, a las págs. 5-6, 20-29, 32-33, 37-52.) Esta asociación y su gestión a nombre de los Concesionarios fueron reconocidas por GMODC y GM en sus contestaciones por medio de cartas. (Alegato de la Parte Recurrida, Anejos Núms. 13, 15, 19-21, a las págs. 30-31, 34-36, 53-58.)
*613 Luego de varios trámites procesales, entre los que se destaca haberse designado como Comisionado Especial (“Comisionado”) en el presente caso al Ledo. Wilfredo Alicea López, el 20 de mayo de 2004, por razón de la Moción de Descalificación de la Leda. Emma Sara Pórtela, GMODC y GM cuestionaron el que la Leda. Pórtela representara en el pleito de epígrafe a los Concesionarios, los que contrataron sus servicios como representante legal mediante Contrato de Servicios Profesionales suscrito el 21 de agosto de 1997. En la cláusula número siete (7) de dicho contrato, los Concesionarios redujeron a escrito su voluntad de: (1) no transigir el pleito de manera individual; y (2) dirigir cualquier acercamiento de ese tipo a la Leda. Pórtela. 
En su escrito, GMODC y GM plantearon ante el Comisionado que la representación incurrida por la Leda. Pórtela les causaba perjuicio y desventaja indebida al impedirles la pronta resolución del pleito mediante ofertas de transacción individuales para con cada uno de los co-demandantes, intervención que dijeron viola la política pública que favorece que los pleitos se transijan. Alegaron que la Leda. Pórtela no podía asumir la representación legal de los Concesionarios, ya que dicha actuación constituye una violación a los cánones 19, 21 y 24 de Ética Profesional de la abogacía, pues no es posible que la Leda. Pórtela abogue por una transacción favorable para uno de los co-demandantes y a la misma vez respete los deseos de otros seis (6) que interesan vedar la transacción. Así pues argüyeron que se trataba de una representación simultánea adversa; situación que padece de apariencia impropia a la luz de los Cánones de Ética Profesional enumerados.
La Leda. Pórtela replicó a los planteamientos esbozados por GMODC y GM mediante Oposición a Solicitud de Descalificación de la Leda. Emma Sara Pórtela, presentada el 16 de agosto de 2004. En la misma indicó que ostentaba un Contrato de Servicios Profesionales con los Concesionarios, quienes le contrataron habido acuerdo previo entre ellos sobre la manera en que se habrían de tramitar sus respectivas reclamaciones. La Leda. Pórtela señaló que fueron los Concesionarios quienes convinieron radicar el pleito, distribuir los gastos de la representación legal y transar o decidir la reclamación de manera conjunta. La Leda. Pórtela apuntó que la iniciativa de GMODC y GM de solicitar su descalificación responde a las tácticas dilatorias que éstas habían empleado durante los siete (7) años que hasta entonces había durado el litigio y señaló que su gestión profesional a favor de los Concesionarios no es contraria a la ley, la moral o al orden público, por lo que alegó la inexistencia de conflicto. El contrato de servicios fue ratificado por los Concesionarios el 27 de mayo de 2004. 
Analizados los escritos de las partes y tras balancear los factores a favor y en contra de la descalificación, el 27 de septiembre de 2004, el Comisionado entendió que no procedía la solicitud de descalificación presentada por GMODC y GM, al concluir que:
“El planteamiento que esgrime la parte demandada [(GMODC y GM)] de que la aludida cláusula es contraria al canon de Etica Profesional, porque le impide formalizar acuerdos transaccionales con cualquiera de las partes, no justifica, tomando en consideración las circunstancias particulares de este litigio y las probables consecuencias del mismo que el Tribunal, intervenga con la autonomía contractual de las partes contratantes. Dicha intervención se justifica solamente cuando existen circunstancias extraordinarias y la misma debe ejercerse con cautela por su efecto lesivo en la estabilidad de los contratos y en la seguridad jurídica. Dichas circunstancias no están presentes en este caso, pues no existe una situación tal de onerosidad para la demandada [(GMODC y GM)] o una desorbitada desproporción, que amerite nuestra intervención para dejar sin efecto la referida cláusula. Por el contrario la cláusula, según la intención de las codemandantes [(Concesionarios)], lo que persigue es unir intereses para enfrentarse unidos a una parte alegadamente económicamente más poderosa que ellas.” (Citas omitidas.) (Alegato de la Parte Recurrida, Anejo Núm. 52, a las págs. 313-321.)
De otra parte, habiendo hecho mención del avanzado estado procesal del caso, el Comisionado añadió no estar en posición de determinar que la Leda. Pórtela tuviese un posible conflicto de intereses personales y de representación simultánea, pues:
*614 “[HJasta el presente no se ha suscitado en el caso un conflicto real o potencial de intereses entre los codemandantes [(Concesionarios)] que ponga en tela de juicio la lealtad que [la Leda. Pórtela] le debe a sus clientes. ... Por el contrario, la comunidad de intereses entre ellas hasta el presente se ha mantenido y no ha sido necesario aplicar el Canon 21. ” (.Alegato de la Parte Recurrida, Anejo Núm. 52, a las págs. 313-321.)
Inconformes, GMODC y GM presentaron, el 13 de octubre de 2004, una Moción de Reconsideración en la que reiteraron sus planteamientos a favor de la descalificación de la Leda. Pórtela y solicitaron que en la alternativa se decretara la cláusula séptima del contrato de servicios profesionales “inválida y nula por ser contraria al Orden público”. (Petición de Certiorari, Anejo Núm. 12, a las págs. 168-174.) Por su parte, el 21 de octubre de 2004, la Leda. Pórtela presentó Oposición a Moción de Reconsideración alegando la inexistencia de conflicto de intereses por representación simultánea adversa, pues asegura haber mantenido a los Concesionarios adecuadamente informados de todas las comunicaciones transaccionales, las cuales han sido rechazadas unánimemente por “irrisibles”. (Petición de Certiorari, Anejo Núm. 13, a las págs. 175-184.) Acogida la Moción de Reconsideración y atendidos los reclamos de las partes, el 18 de noviembre de 2004, el Comisionado emitió Resolución del Comisionado Especial declarando Sin Lugar la referida solicitud de reconsideración.
Así las cosas, oportunamente GMODC y GM presentaron ante el TPI, el 2 de diciembre de 2004, una Objeción al Amparo de la Regla 41 a Resolución del Comisionado Especial donde nuevamente alegaron a favor de la descalificación de la Leda. Pórtela o que en la alternativa se decretase la nulidad de la referida cláusula séptima del contrato de servicios. Recibida la Oposición de las Co-demandantes a Objeción Presentada por Parte Demandada a la Resolución Emitida por el Comisionado Especial el 19 de octubre de 2004, presentada por los Concesionarios en 9 de diciembre de 2004, el 14 de marzo de 2005, notificada el 29 de ese mes y año, el TPI emitió Resolución en la que declaró Sin Lugar los planteamientos de GMODC y GM, al aprobar e incorporar de forma íntegra la determinación del Comisionado declarando Sin Lugar la solicitud de descalificación contra la Leda. Pórtela.
Como hemos informado, el 28 de abril de 2005, GMODC y GM presentaron ante este Tribunal un escrito de Certiorari en el que solicitaron la revisión de la Resolución emitida el 14 de marzo de 2005 por el TPI, señalando que erró dicho foro al declarar Sin Lugar la solicitud de descalificación de la Leda. Pórtela. 
II
En el caso de autos, se solicitó la descalificación de la Leda. Pórtela al amparo de los cánones 19, 21 y 24 de Ética Profesional.
El Canon 21 de Ética Profesional, 4 L.P.R.A. Ap. IV, C. 21 {“Canon 21”), en lo pertinente, establece que:

“El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en controversia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.

No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente ” (Énfasis suplido.)
En esta misma línea de pensamiento fue adoptado el Canon 38 de Ética Profesional, 4 L.P.R.A. Ap. IV, C. 38. Éste dispone la preservación del honor y dignidad de la profesión al establecer que:
*615 “El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. ” (Enfasis suplido.)
En Otaño v. Vélez, 141 D.P.R. 820, 825-826 (1996), citando entre otros a Liquilux Gas Corp. v. Berríos, Zaragoza, 138 D.P.R. 850, 857-858 (1995), el Tribunal Supremo reiteró que la obligación de lealtad al representar a un cliente, según recogida en el Canon 21, incluye: “(1) ejercer un criterio profesional independiente y desligado de sus propios intereses, y (2) no divulgar los secretos y las confidencias que el cliente haya compartido durante el transcurso de sus representaciones pasadas y presentes”. En consideración a lo anterior, jurisprudencialmente se han reconocido tres (3) situaciones que deberán ser evitadas por todo abogado; estas son:
“[Q]ue en beneficio de un cliente se abogue por aquello a lo que el letrado debe oponerse en cumplimiento de sus obligaciones para con otro cliente; que un abogado acepte la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de un cliente anterior; y que un abogado acepte una representación legal, o que continúe en ella, cuando su juicio pueda ser afectado por sus intereses personales. ” In re: Ortiz Martínez, Op. de 6 de abril de 2004, 2004 J.T.S. 69, a la pág. 956; Otaño, 141 D.P.R., a la pág. 826.
Así pues, de una parte se prohíbe aceptar la representación de un cliente cuyos intereses estén reñidos con los del abogado y de otra se prohíbe aceptar la representación de un cliente en asuntos que puedan afectar cualquier interés de otro cliente con el propósito de garantizarle a todo representado “que las confidencias y los secretos que compartió con su abogado no serán utilizados en su contra, en beneficio de una representación antagónica de un cliente simultáneo o posterior”. Otaño, 141 D.P.R., a la pág. 826; P.R. Fuels, Inc. v. Empire Gas Co., Inc., 133 D.P.R. 112, 118 (1993). En cuanto resulte adversa la representación simultánea de dos clientes, nuestro más alto foro ha previsto que: “no cabe duda que el único remedio disponible para el abogado es renunciar a ambas representaciones y no sólo a una”. (Citas omitidas.) Liquilux Gas Corp., 138 D.P.R., a las págs. 859-860.
La descalificación de un abogado de un proceso judicial no constituye de por sí una acción disciplinaria, sino más bien una medida preventiva para evitar posibles violaciones a los Cánones de Etica Profesional. Meléndez v. Caribbean Int'l. News, 151 D.P.R. 649, 660 (2000); Liquilux Gas Corporation, 138 D.P.R., a la pág. 864. Esta medida responde al poder inherente del tribunal de tomar providencias dirigidas a supervisar y controlar la conducta de los abogados que postulan ante éste. Meléndez, 151 D.P.R., a las págs. 660-661. De otra parte, también se ha reconocido la descalificación como un mecanismo para asegurar la adecuada marcha de un litigio, fundamentándose en el deber de todo tribunal de mantener el orden y el control de los procedimientos que se ventilan en ellos. Meléndez, 151 D.P.R., a la pág. 161.
En síntesis, los Tribunales pueden otorgar la descalificación de un abogado en una de dos situaciones: (1) como prevención de una violación de cualquiera de los Cánones de Ética Profesional; y (2) para prevenir actos disruptivos de los abogados durante el trámite de un pleito. Meléndez, 151 D.P.R., a la pág. 161.
Ante una descalificación motu proprio por parte del tribunal o a solicitud de parte, no es necesario aportar prueba sobre una violación ética para que la misma proceda. Así pues, en Meléndez, 151 D.P.R., a las págs. 661-662, nuestro Tribunal Supremo reiteró que ante cualquier duda sobre un posible conflicto de interés podrá ser utilizada la “apariencia de impropiedad’ a favor de la descalificación.
Sin embargo, al evaluar una solicitud o moción de descalificación presentada por la parte adversa en el pleito, el tribunal deberá sopesar los intereses en conflicto. A tales efectos, el tribunal debe evaluar la totalidad de las circunstancias para valorar los siguientes criterios:
*616 “[S]i quien solicita la descalificación tiene legitimación activa para invocarla, la gravedad del conflicto de interés implicado, la complejidad del derecho o los hechos pertinentes a la controversia y el expertise de los abogados involucrados, la etapa de los procedimientos en que surja la controversia sobre descalificación y su posible efecto en cuanto a la resolución justa, rápida y económica del caso, y el propósito detrás de la descalificación, es decir, si la moción de descalificación está siendo utilizada como mecanismo procesal para dilatar los procedimientos”. Otaño, 141 D.P.R., a la pág. 828; Liquilux Gas Corp., 138, D.P.R., a las págs. 864-865.
Además, junto a los factores esbozados, el tribunal debe sopesar el derecho que tiene todo ciudadano a escoger libremente el abogado que lo represente. Otaño, 141 D.P.R., a la pág. 828; Sánchez Acevedo v. E.L.A., 125 D.P.R. 432, 438 (1990); In re: Vélez, 103 D.P.R. 590, 599 (1975).
Si bien el Tribunal debe realizar un análisis de la totalidad de las circunstancias sopesando dichos factores, la determinación que hace el Tribunal de Primera Instancia en estos casos es una decisión discrecional. Así pues, como un juez tiene la potestad de descalificar a un abogado si ello resulta necesario para lograr la solución justa, rápida y económica del pleito, del mismo modo puede denegar una solicitud de descalificación cuando entienda que ésta ha sido interpuesta como una táctica dilatoria del procedimiento. Meléndez, 151 D.P.R., a la pág. 661. De cualquier modo, en estos casos, los foros apelativos intervendremos solamente cuando dicho tribunal haya incurrido en arbitrariedad o claro abuso de discreción. Meléndez, 151 D.P.R., a las págs. 664-665.
Según reconocido por nuestro más alto foro, el Canon 21 no tiene disposición alguna que vede la representación sucesiva o simultánea de dos (2) Chentes por un mismo abogado ante la total ausencia de un posible conflicto de intereses entre ambas representaciones. Otaño, 141 D.P.R., a la pág. 827. Pese a lo anterior, es menester reiterar que la mera apariencia de impropiedad bastará para que un tribunal descalifique motu .proprio a un abogado que .pudiera entrar en un conflicto de intereses^ En estos _casos no es necesaria la aportación de prueba sobre la violación ética. Lo único que es requerido es una relación de abogado-cliente que esté sustancialmente relacionada con la materia o causa de acción en la que tal abogado representa o representó a otro y el efecto adverso que surge de la representación dual. Otaño, 141 D.P.R., a las págs. 827-828; P.R. Fuels, Inc., 133 D.P.R., a la pág. 119; In re: Carreras Rovira y Suárez Zayas, 115 D.P.R. 778, 791-792 (1984).
De lo antes esbozado, podemos colegir que el Canon 21, prohíbe tanto la representación concurrente como sucesiva, siempre que exista una "relación sustancial" entre el asunto anterior y posterior que implique intereses adversos.
En nuestra jurisdicción, “[e]l contrato de servicios profesionales de abogado está revestido de un alto contenido ético, que lo distingue de un contrato ordinario de arrendamiento de servicios”. In re: Merced Montañez, Op. de 22 de abril de 2005, 2005 J.T.S. 85; Nassar Rizek v. Hernández, 123 D.P.R. 360 (1989); Colón v. All Amer. Life & Cas. Co., 110 D.P.R. 772 (1981).
Como parte de los deberes del abogado para con sus clientes, el Canon 19 de Ética Profesional, 4 L.P.R.A. Ap. IV, C. 19 (“Canon 19”), dispone, en lo pertinente, que:

“Siempre que la controversia sea susceptible de un arreglo o transacción razonable debe aconsejarse al cliente el evitar o terminar el litigio, y es deber del abogado notificar a su cliente de cualquier oferta de transacción heckapo~r la olraparté.

El abogado que representa varios clientes con intereses comunes o relacionados entre sí no debe transigir ninguno de los casos envueltos sin que cada cliente esté enterado de dicha transacción y sus posibles consecuencias”.

*617 En esta misma línea de pensamiento, el Canon 24 de Ética Profesional, 4 L.P.R.A. Ap. IV, C. 24 (“Canon 24”), señala que: “[e] l abogado debe acatar los deseos de un cliente ansioso de transigir su pleito”.
De otra parte, nuestro ordenamiento ha prescrito que “la fijación de honorarios profesionales deberá regirse siempre por el principio deontológico que la profesión legal es parte de la administración de la justicia y no un mero negocio con fines de lucro. ” In re: Merced Montañez, 2005 J.T.S. 85. Así pues, si bien es cierto que el abogado tiene derecho a recibir una compensación razonable por los servicios que rinde a sus clientes, nuestro más alto foro ha reiterado que:
“[Ljos honorarios contingentes no están reñidos con la ética cuando redunden en beneficio para el cliente, o cuando el cliente lo prefiera una vez informado de sus particularidades y sus consecuencias o, cuando el mismo no sea excesivamente oneroso que logre alcanzar dimensiones de mala fe. In re: Criado Vázquez, res. 29 de octubre de 2001, 155 D.P.R. _, 2001 J.T.S. 155; Méndez v. Morales, 142 D.P.R. 26 (1996); In re: Clavell Ruiz, 131 D.P.R. 500 (1992). Mediante este tipo de acuerdo, el abogado se hace partícipe en el resultado del caso que tramita para recibir así un por ciento de la cuantía que reciba su cliente. ” (Énfasis supbdo.) In re: Criado Vázquez, ante. In re: Merced Montañez, 2005 J.T.S. 85.
En consideración a lo anterior, el Canon 24 recoge los criterios a ser considerados en la fijación de honorarios. En lo pertinente, dicho precepto ordena que:

“La fijación de honorarios profesionales debe regirse siempre por el principio de que nuestra profesión es una parte integrante de la administración de la justicia y no un mero negocio confines de lucro.

Un abogado debe exigir el pago de honorarios contingentes sólo en aquellas ocasiones en que dichos honorarios sean beneficiosos para su cliente, o cuando el cliente lo prefiera así después de haber sido debidamente advertido de las consecuencias.

Con el propósito de que los clientes estén protegidos contra cargos injustos, los honorarios contingentes deben ser razonables y estar siempre sujetos a la aprobación del tribunal, en aquellos casos en que la intervención judicial sea requerida por ley o por alguna de las partes en el litigio. ”

Sabido es que en Puerto Rico rige el principio de la libertad de contratación. Unisys Puerto Rico, Inc. v. Ramallo Brothers Printing, Inc., 128 D.P.R. 842, 850 (1991). Como parte de esta norma, “los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". Art. 1207 del Código Civil, 31 L.P.R.A. § 3372. Una vez establecidas las cláusulas y condiciones del acuerdo, se entenderá perfeccionado el contrato por el consentimiento entre las partes y, desde ese momento, cada una de ellas vendrá obligada no sólo a cumplir con lo expresamente pactado, sino también con las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 L.P.R.A. § 3375. Esa obligación de cumplir con lo pactado se funda en el principio de la buena fe, la cual exige no defraudar la confianza que otro ha puesto en una promesa o conducta. Unisys Puerto Rico, Inc., 128 D.P.R., a la pág. 852 (citando a L. Diez-Picazo, Fundamentos de Derecho Civil Patrimonial, 2da ed., Madrid, Ed. Tecnos, 1983, Vol. I, Cap. IV, pág. 99).
El Artículo 1044 de nuestro Código Civil, 31 L.P.R.A. § 2994, postula que “...las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes y deben cumplirse al tenor de los mismos”. Por su parte, los tribunales están facultados para velar por el cumplimiento de los contratos y éstos no deben relevar a una parte del cumplimiento de su obligación contractual, cuando dicho contrato sea legal, válido y no contenga vicio alguno. Cervecería Corona v. Commonwealth Ins. Co., 115 D.P.R. 345, 351 (1984); Olazábal v. *618 U.S. Fidelity, 103 D.P.R. 448, 462 (1975).
III
Como regla general, este Tribunal no interviene con el ejercicio de la discreción de los Tribunales de Primera Instancia, a menos que sea demostrado que hubo un craso abuso de discreción, que el foro apelado erró en la interpretación o aplicación de cualquier norma procesal o que nuestra intervención en esta etapa evitará un perjuicio sustancial. Lluch v. España Service Sta., 117 D.P.R. 729, 745 (1986). Así se reiteró nuestro más alto foro en García Rubiera, et als. v. Asociación de Suscripción Conjunta de Seguro de Responsabilidad Obligatoria, Op. de 12 de julio de 2005, 2005 J.T.S. 108, a la pág. 1555, al enunciar que “en nuestro ordenamiento jurídico impera la norma de que un tribunal apelativo sólo intervendrá con las determinaciones interlocutorias discrecionales procesales del tribunal sentenciador cuando este último haya incurrido en arbitrariedad o en un craso abuso de discreción”.
En el caso de autos, la descalificación la solicitó la parte contraria, es decir, los demandados y aquí peticionarios GMODC y GM, al argumentar que existe un posible conflicto de interés que se debe evitar mediante la descalificación de la Leda. Pórtela. Arguyen que la situación creada por lo pactado en el Contrato de Servicios Profesionales entre la Leda. Pórtela y los Concesionarios ha creado una situación de representación simultánea adversa que conlleva problemas de índole ético profesional en lo relativo a la lealtad que los abogados tienen para con sus Chentes. Sin embargo, el examen del informe emitido por el Comisionado en el caso de epígrafe, según acogido por el TPI al dictar la Resolución emitida el 14 de marzo de 2005, refleja que la controvertida cláusula séptima del Contrato de Servicios Profesionales no representa una situación onerosa para GMODC y GM, de manera que: (1) se suscite un conflicto de intereses personales en la Leda. Pórtela por razón de representación simultánea adversa; o (2) sea meritoria la intervención de los tribunales para dejarla sin efecto.
Como hemos informado, se conoce que no es propio de un profesional el representar intereses encontrados. Este deber requiere que el criterio profesional del abogado esté desligado tanto de intereses personales como de intereses de terceras personas (clientes coetáneos o anteriores) que sean incompatibles con los del representado. Al aplicar la normativa antes expuestas, sólo podemos concluir que la prueba y las alegaciones presentadas por GMODC y GM en el caso de autos no son suficientes para justificar la descalificación de la Leda. Pórtela como abogada de los Concesionarios. De los hechos ante nos, GMODC y GM no demostraron una relación sustancial de intereses adversos existente entre los Concesionarios que motivase impedimento alguno para ejercer sus representaciones de manera simultánea. Al contrario, la Leda. Pórtela representa a una asociación que agrupa a los Concesionarios, los que se han comprometido mediante contrato a unirse y mantenerse como grupo durante el presente litigio. Nada vemos en esta solidaridad que sea contrario a los Cánones de Ética Profesional.
Al examinar los criterios adoptados por nuestro Tribunal Supremo, a los fines de sopesar una solicitud de descalificación, vemos que el TPI llevó a cabo un justo balance entre el supuesto conflicto de interés y el perjuicio a ser causado por dicha descalificación. Veamos.
En primer lugar, los peticionarios de epígrafe no tenían legitimación activa para solicitar la descalificación, toda vez que no demostraron que la representación simultánea de los Concesionarios por parte de Leda. Pórtela les causó un perjuicio o desventaja indebida en el caso. Más allá del hecho de que la Leda. Pórtela como representante de los Concesionarios: (1) acató la voluntad de éstos de enfrentarse a GMODC y GM como grupo; y (2) cumplió con la voluntad expresa de sus representados de no aceptar ninguna transacción individual o acuerdo similar cuyo fin sea otro que transigir “todo el pleito para todos los reclamantes”, no surge del récord ninguna otra circunstancia que cause el alegado perjuicio a los codemandados. Así pues, estas razones no son suficientes para cumplir con el requisito de legitimación activa, toda vez que esa es precisamente la función de cualquier representante, auxiliar a sus clientes dentro del margen de lo dispuesto por la ley, la moral y el orden público. Como hemos mencionado, el Canon 19 delega al abogado la responsabilidad de notificar al *619 cliente cualquier oferta de transacción y de aconsejarle que evite un litigio susceptible de arreglo; sin embargo, nada de lo previsto en dicha disposición veda el que varios clientes con intereses comunes y representados por un mismo abogado decidan no transigir ninguno de los casos envueltos sin que cada uno apruebe la transacción.
Ante los hechos expuestos y examinada la doctrina prevaleciente sobre la libertad de contratación, GMODC y GM no han demostrado que el acuerdo de costear este pleito como grupo y de no transigir el pleito individualmente (sino que se transija por el grupo entero y para beneficio de los intereses comunes de sus miembros), haya provocado una situación de desventaja que amerite la intervención de los tribunales con la autonomía contractual de los Concesionarios. Al contrario, nos inclinamos a pensar que GMODC y GM pretenden utilizar la estrategia de “dividir y conquistares decir, ofrecerle a un miembro de la Asociación de Concesionarios una buena oferta de transacción para fomentar la desunión y discordia dentro del grupo.
De otra parte, sostienen GMODC y GM que la intervención de la Leda. Pórtela ha sido seriamente afectada por sus intereses personales en la transacción, ya que afirman que la referida cláusula séptima del contrate fue redactada con el fin de asegurarse la “maximación” de los honorarios contingentes, creando una apariencia de conducta conflictiva. No les asiste la razón. De la simple lectura del contrato se desprende que si bien el acuerdo de compensación entre los Concesionarios y la Leda. Pórtela contempla un pago “adicional” equivalente al treinta porciento (30%) de la transacción, en caso de que el pleito sea transigido, el contrato provee de manera expresa que: “[a] tal cantidad se le rebajará la cantidad pagada por servicios profesionales facturados mensualmente”. (.Alegato de la Parte Recurrida, Anejo Núm. 24, a las págs. 66-70.) Conforme a la doctrina expuesta, los honorarios contingentes no están reñidos con los Cánones de Ética Profesional ni ninguna otra disposición estatutaria. Así pues, habiendo sido preferidos por los representados, nuestro ordenamiento ha prescrito que no se considerará conflictivo el pago de honorarios contingentes por el mero hecho de que el abogado se haga partícipe del resultado del caso.
Finalmente es menester considerar que, indiscutiblemente, se requiere un tiempo razonable para prepararse en este tipo de caso y la preparación de otro abogado, con toda probabilidad, conlleva un atraso en los procedimientos. Es importante notar que la Leda. Pórtela ha representado a los Concesionarios ante el TPI durante un período de aproximadamente ocho (8) años. Ciertamente, la etapa en la que se encuentran los procedimientos es un factor importante a considerar, y habiéndose dictado sentencia parcial en el caso, sin lugar a dudas se inclina la balanza en contra de la descalificación de la representante legal.
Así las cosas y a tenor con la doctrina antes expuesta, es forzoso concluir que de los documentos y argumentos esbozados por GMODC y GM no surge la existencia de un conflicto real; ni siquiera existe algún conflicto potencial o aparente que haga necesaria la descalificación de la Leda. Pórtela como representante legal de los Concesionarios.
IV
Por los fundamentos antes expresados, se expide el recurso solicitado y se dicta Sentencia confirmando la Resolución emitida el 14 de marzo de 2005 por el TPI.
Lo acuerda y manda este Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones